NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL ASSOCIATION OF
HEAT AND FROST INSULATORS
AND ASBESTOS WORKERS, AFL-
CIO, Local 31, et al., Respondents.

No. 5378.

United States Court of Appeals
First Circuit.

Dec. 4, 1958.

Arnold Ordman, Atty., Washington, D. C., with whom Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frederick U. Reel, Atty., Washington, D. C., were on brief, for petitioner.

Henry Wise, Boston, Mass., with whom Robert L. Wise, Boston, Mass., was on brief, for respondents.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition by the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 29 U.S.C.A. § 151 et seq.) for enforcement of its order and supplemental order against Local 31, International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO, and its officers, agents, suc-cessors and assigns. The original decision and order of December 29, 1955 held that the respondents by causing an employer, the Rhode Island Covering Company, to discriminate against two non-union employees, John Frank and Joseph S. Aguiar, in violation of § 8(a) (3) of the Act, had themselves violated § 8(b) (2) of the Act. It further found that the respondents had restrained and co-erced Rhode Island Covering Company's employees in the exercise of their rights under § 7 of the Act, thus committing an additional unfair labor practice under § 8(b) (1) (A).

The respondents were ordered to cease and desist from the continuation of such unfair labor practices and the Union was also ordered to make whole Frank and Aguiar for any loss of earnings they may have suffered because of the discrimination against them. An additional hearing was then held following which the Board in its supplemental order of December 13, 1957 ordered the Union to pay Frank $2,770.31 and Aguiar $1,745.-19.

The questions involved in this appeal are whether substantial evidence supports the findings (1) that respondents caused job preference to be granted to Union members in violation of §§ 8(b) (1) (A) and (2) of the Act, (2) that respondents caused the Rhode Island Covering Company (hereinafter called the Company) to discriminate against Frank and Aguiar in violation of §§ 8(b) (1) (A) and (2) of the Act and (3) the amount of back pay awards to Frank and Aguiar.

It appears that for several years prior to December 18, 1953 the Company had employed both union and non-union employees, numbering about fifty-five in all. On that date, the union employees who were about thirty in number went out on strike due to the failure of the Union to reach a new agreement with the Company. To replace the union men, the Company hired about thirty new men, among whom were Frank, who was hired about January, 1954 and Aguiar, who was hired in March of 1954. Most of the em-

ployees of the Company were apparently engaged in installing insulation and covering pipes in buildings under construction under subcontracts to the general building contractors. One of the largest of these subcontracts was for the installation of insulating material on the Rhode Island Hospital. When four non-union employees were put on this job in May, 1954, the respondent Union placed two pickets at the hospital. About three hundred other craft workers then ceased working whereupon the Company's four non-union employees left the job. Upon their leaving, work was resumed by the other craft employees. The Company made no other attempt to perform its subcontract at the Rhode Island Hospital during the remainder of the strike. On May 27, 1954 the Company and the Union entered into an agreement whereby the Union was recognized as the exclusive bargaining representative of the employees. The contract contained a maintenance of membership clause and also a provision whereby the Union was recognized as "the established and prime source of skilled and dependable labor * * *. The Employer agrees that on each occasion of need for such labor, it shall call on the Union to furnish qualified workmen * * *. Should a shortage of workmen exist and they cannot be supplied by the Union, after a forty-eight (48) hour notice to it, the Employer may procure qualified workmen from other sources but such other workmen shall apply for and, subject to the laws and regulations of the Union, become members of the Union within thirty (30) days from the date of employment."

Following the strike settlement, the Company sent about twenty-three non-union men, including Frank and Aguiar, to the hospital job although many of the striking Union men had returned to work. In mid June the president of the Company was informed by Jentzel, the Union business agent, that non-union men could not work at the hospital after June 27, 1954 and that if non-union men

were so employed the Union men would not work. It appears that of the twenty-three men plus the foreman who were working on the hospital job on June 25, 1954, eight were taken into the Union at about that time along with eleven other Company employees. All these employees had been working for the Company on December 18, 1953 and it was orally agreed as part of the settlement between the Company and the Union that these men would be allowed to become members of the Union. However, the other sixteen non-union employees were told to report at the Company office on Monday, July 28, 1954 rather than at the hospital because they were not to be taken into the Union. Both Frank and Aguiar and nine other non-union men who had been on the hospital job and had not been with the Company on December 18, 1953 sent registered letters on or about June 22, 1954 to the Union requesting admission to membership. These letters as well as subsequent telephone conversations with Jentzel produced no action by the Union upon their applications. The trial examiner found that since June 28, 1954 only one of the employees [1] laid off the hospital job had been assigned to insulating work within the geographical area over which the Union claimed jurisdiction. The president of the Company testified that he did not consider any non-union men for employment on the hospital job after June 28, 1954 because he believed that the union men would walk off the job if the non-union men were employed and he wanted to avoid trouble.

The Board first found that the "first opportunity" clause of the agreement, supra, between the Company and the Union, while not violative of the Act on its face, was carried out in such a discriminatory manner so as to prefer Union members and, therefore, violated both § 8(b) (1) (A) and because it caused the Company to discriminate, § 8(b) (2) of the Act. This finding is clearly supported by statements made by Jentzel who admitted that when the Union was called

---

1. This employee was a member of the Plasterer's Union and received Jentzel's approval before being sent on the job.

upon by an employer under this clause, it would refer men from a list of Union members and these would be the only people considered for the job. Jentzel further testified that he never sent any non-union men to the Rhode Island Covering Company.

It is not illegal for an employer to rely upon a union to provide it with employees. In some industries such as construction and shipping, where much of the work is necessarily of an intermittent nature and the employer's need for workers varies from day to day, a hiring hall or referral system has sprung up. Under this system the employer calls upon the union to supply him with the necessary workers. However, if this system operates so as to discriminate against non-union workers and makes possible only the employment of union members, it is an unfair labor practice. See Eichleay Corp. v. National Labor Relations Board, 3 Cir., 1953, 206 F.2d 799; National Labor Relations Board v. National Maritime Union, 2 Cir., 1949, 175 F.2d 686, certiorari denied, 1950, 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589. It has been held when a "first opportunity" clause is interpreted so as to preclude the employment of non-union members, it constitutes an invalid union-security device under §§ 8(b) (1) (A) and 8(b) (2) of the Act. National Labor Relations Board v. George D. Auchter Co., 5 Cir., 1954, 209 F.2d 273. In the instant case the commission by the respondents of unfair labor practices through their institution and conduct of this referral system is supported by substantial evidence in the record.

The Board's second finding that the Company, when it removed Frank and Aguiar from the Rhode Island Hospital job, had yielded to union pressure exerted in violation of §§ 8(b) (1) (A) and (2), is amply supported by the record. Both the foreman on the job and the Company president were warned that the union men would be called off the job if forced to work alongside non-union men such as Frank and Aguiar after June 27, 1954. The Company president explained to the laid-off men on June 28, 1954 that they could no longer work on the Rhode Island Hospital job because they did not belong to the Union. The Company's president specifically stated at the hearing that he could no longer consider Frank and Aguiar for employment on the hospital job because he feared that to do so would cause the union men to walk off. That the Union had the power to cause such a cessation of work at the job was clearly demonstrated by the strike which had occurred in May. The lay-off of Frank and Aguiar was thus not a unilateral act on the part of the employer but was caused by the Union in violation of § 8 (b) (2). See National Labor Relations Board v. Local 369, etc., 3 Cir., 1956, 240 F.2d 539. In view of the fact that the Union's discriminatory tactics were generally directed against the employment of all non-members, rather than merely against one individual, the further finding of a § 8(b) (1) (A) violation was proper.

The Union's third contention is that the back pay order was improper. One ground of this contention is that the standard of what union journeymen had earned should not have been the sole basis upon which to determine what Frank and Aguiar would have earned had they not been laid off. But the Board was entitled to use this standard in view of the Company president's explanation that Frank and Aguiar would have continued in their journeymen status on the Rhode Island Hospital job and on other work except for Union pressure. Respondents also contend that reinstatement is a condition precedent to the Board's authority to compel a back pay award but as was said in National Labor Relations Board v. Local 1423, etc., 5 Cir., 1956, 238 F.2d 832, this argument is foreclosed by the decision in Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. National Labor Relations Board, 1954, 347 U.S. 17, 74 S.Ct. 323,

98 L.Ed. 455.[2]  Bearing in mind that a back pay order of the Board "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act", National Labor Relations Board v. Seven-Up Co., 1953, 344 U.S. 344, 347, 73 S.Ct. 287, 289, 97 L.Ed. 377; see National Labor Relations Board v. Alaska Steamship Co., 9 Cir., 1957, 245 F.2d 282, we find no merit in the respondents' other contentions concerning the back pay order.

A decree will be entered enforcing the orders of the Board.

2. The respondents' contention that the Company should be required to contribute toward making Frank and Aguiar whole also lacks weight in view of the holding in Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. National Labor Relations Board, supra, 347 U.S. at page 52, 74 S.Ct. at page 342.