HONOLULU STAR–BULLETIN, LTD.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Honolulu Typographical Union No. 37,
Intervenor.

No. 15044.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 20, 1959.

Decided Nov. 25, 1959.

Mr. J. Garner Anthony, of the bar of the Supreme Court of Hawaii, Honolulu, Hawaii, pro hac vice, by special leave of court, with whom Mr. Milton C. Denbo, Washington, D. C., was on the brief, for petitioner.

Mr. Thomas E. Shroyer, Washington, D. C., also entered an appearance for petitioner.

Mr. Melvin Pollack, Atty., N. L. R. B., with whom Mr. Thomas J. McDermott, Associate Gen. Counsel, N. L. R. B., and Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.

Mr. Gerhard Van Arkel, Washington, D. C., with whom Messrs. Henry Kaiser, Washington, D. C., George Kaufmann, New York City, and David I. Shapiro, Washington, D. C., were on the brief, for intervenor.

Before PRETTYMAN, Chief Judge, and EDGERTON and WILBUR K. MILLER, Circuit Judges.

PRETTYMAN, Chief Judge.

This is a petition to review an order of the National Labor Relations Board; there is also a cross-petition for enforcement of the order. Our petitioner, Honolulu Star-Bulletin, Ltd., publishes a daily newspaper in Hawaii and also has a commercial printing business. After collective bargaining it entered into a contract with the Honolulu Typographical Union No. 37, an affiliate of the International Typographical Union, AFL–CIO. The employees involved were those in the composing room.

The company discharged two employees, named Tamanaha and Van Kralingen. They brought charges against the company, and the General Counsel to the Board issued a complaint charging unfair labor practices. The complaint alleged that the company discharged and refused to reinstate Van Kralingen because of his activities on behalf of the Union and because of other concerted activities for the purpose of collective bargaining. It alleged that the company discharged Tamanaha at the demand of the Union because his Union membership was revoked by the Union for his failure to complete a course of study provided by the Union. The Union intervened in the proceeding in support of the company.

The Board held that the contract between the company and the Union was illegal *per se* and that the two employees were discharged in violation of the statute. It ordered the reinstatement of the two men with back pay. It further ordered the company to reimburse all its employees and former employees in the composing room for all dues and assessments paid to the Union during the period covered by the charges, fixed as beginning six months prior to the service of the initial charges.

The Board held that the contract required the employment of Union members only, unlawfully delegated to the Union complete unilateral control over the hiring process, and made the payment of dues and assessments a condition of employment. In summary, as the Board tells us in its brief here, its holding was that the contract incorporated closed-shop provisions which appear in the General Laws of the International Typographical Union. The Board's rea-

soning was that the shop foreman was a member of the Union, that he had the power to hire and fire, and that he, as a member of the Union, was bound by the General Laws of the Union.

■ The foregoing ruling of the Board is conclusively refuted by the terms of the contract. The pertinent provisions are:

"Section 2. *Employees.* (a) The words 'employee' or 'employees' when used in this agreement apply to journeymen and apprentices. The term 'journeymen' and 'apprentices' *shall in no way be understood to apply exclusively to members of the* International Typographical *Union*.

\* \* \* \* \* \*

"Section 24. \* \* \*

\* \* \* \* \* \*

"(c) \* \* \* It is understood and agreed that the general laws of the International Typographical Union, in effect January 1, 1956, *not in conflict with federal* and territorial (state) *law or this contract,* shall govern relations between the parties on conditions not specifically enumerated herein. \* \* \*." (Emphasis added.)

The provisions of Section 2(a), above quoted, seem to us to be clear beyond question. The specific provision was that employees, who must be journeymen or apprentice printers, need not be members of the Union. Section 24(c), as shown by the above quotation, clearly provided that the General Laws of the Union in conflict with either federal law or the contract itself were not included in the contract. A closed-shop provision would have been in conflict with the federal law [1] and also in conflict with Section 2

(a) of the contract. Any such provision in the General Laws was excepted from inclusion in this contract. We do not see how language could have been clearer.[2]

If the terms of the contract were ambiguous, which we think they are not, we would look to the conduct of the parties under the contract to ascertain its meaning. The fact is that, for some years prior to, as well as during, the events here involved, five of the thirty-five employees in the composing room were non-Union men. During the year preceding the hearing the foreman, who had power to hire, had employed four non-Union men. These facts support the provisions of the contract as we read them.

As a matter of fact Article XIV of the General Laws of the Union provides specifically that "In circumstances in which the enforcement or observance of provisions of the General Laws would be contrary to public law, they are suspended so long as such public law remains in effect."

If the matter were open to inference, it seems to us powerful circumstances would be necessary to justify an inference that a Union of so widespread membership and affiliated locals as is this one (the ITU) would deliberately insert in every contract negotiated by it a clause flatly in violation of a federal statute, thus making every such contract illegal. The President of the ITU was careful on this point. Approving this contract he wrote that it was "in compliance with the laws of the International Typographical Union as limited by the Taft-Hartley law."

■ The Board presents two contentions in support of its view. The first is that since the foreman was a Union man

---

1. Labor Management Relations Act § 8(a) (3), 61 Stat. 140 (1947), as amended, 29 U.S.C.A. § 158(a) (3) (1958).

2. We find no merit in the Board's contention that Section 24(c) of this contract is merely a savings clause of the type found ineffectual in Red Star Express Lines of Auburn v. N.L.R.B., 196 F.2d 78 (2 Cir., 1952), and other cases cited to us.

In Red Star the savings clause was held insufficient to remove the coercive effect upon employees of an explicit (illegal) union-security clause. The present contract contained no such explicit provision, and Section 24(c) was not a suspension of the operation of any illegal clause but rather an incorporation of certain general laws.

it must be assumed that he would be guided in his hiring by the Rules of the Union rather than by the contract between his employer and the Union. In the first place, as we have already indicated, such an assumption would be contrary to the fact; he did hire non-Union men. In the second place, a similar argument was made to this court in Milwaukee County and Vicinity of the Carpenters District Council, etc. v. N. L. R. B.[3] and was rejected. The Board's second contention is that the rank and file of employees and potential employees would have the impression that the Rules of the Union, rather than the contract between the employer and the Union, would govern the employment policies of the employer. In other words, the Board says that, since the contract mentions the Rules of the Union, employees would have the impression that the Rules were incorporated in their entirety, and would not differentiate those contrary to law or to the contract. From that premise the Board reasons that the contract is *per se* a closed-shop contract. This conclusion is a complete *non sequitur.* An erroneous impression of plain terms does not change the meaning of the plain terms. Furthermore assumptions that employees will not understand a lawful contract cannot be a basis for holding the contract illegal. What would be the justification for emphatic insistence upon formal collective bargaining as to terms of employment, if the conduct of the parties thereafter is to be judged by speculative, uninformed impressions of those terms instead of by the terms themselves as hammered out at the negotiation table?

The Board says the phrase "not in conflict with federal * * * law" in Section 24(c) of the contract places an onerous burden on employees seeking to determine what the contract in fact provides. As to some conditions in the General Laws of the Union there might be uncertainty; we do not know as to that. But there could hardly be any uncertainty respecting a closed-shop clause so far as this contract is concerned. Furthermore, as counsel for the intervening Union cogently points out, the Board's language in its own order demonstrates the inevitability of some uncertainty and confusion in this general area. The Board twice, in the "Notice to All Employees" which it required to be posted, directs the company to recite an abjuration of certain activities "except to the extent permitted by Section 8(a) (3) of the Act". Counsel pointedly queries whether the latter quoted expression is less confusing than the phrase "not in conflict with federal * * * law". In this connection we are impelled to inquire: What could be more confusing to rank-and-file employees than an official ruling that a contract which specifically says they need not be members of a union means that they must be members?

We hold erroneous the conclusion of the Board that this contract was illegal *per se.*

This brings us to the discharges of the two employees. First as to Van Kralingen: The night foreman, one Blade, under whom Van Kralingen worked, testified in detail and at length that Van Kralingen, on an average of two or three times a night,—"It got to the place where it was rather incessant and continuous" —engaged groups of employees in discussions. He testified that as a result Van Kralingen's production as an individual was down and that "Furthermore, he was disturbing the morale and production of the entire shop." He therefore repeatedly recommended to the foreman of the shop, one Larson, that Van Kralingen be discharged. Blade testified that because of a shortage of labor they decided "to more or less try to neglect it," hoping that the trouble would clear itself up and get better. However, he testified, the difficulty increased—"That was what brought about his discharge."

Van Kralingen had been hired on July 2, 1956. When Larson, the foreman, came to work on November 12, 1956, he found posted on the bulletin board a long

3. 107 U.S.App.D.C. ——, 274 F.2d 564 (1959).

letter signed by Van Kralingen and addressed to "Union Brothers and Sisters". It appears that Van Kralingen was running for chairman of "the chapel", and this was his platform. One item strongly stressed was that the company hired non-Union men. His plan was that the Union invite the non-Union men to join but that, if they were not thus convinced, the Union men should show the non-Union workers "that we do not care to associate with them, either, even to the extent of talking to them." The letter emphasized that the non-Union men were taking home more money than the Union members, because the latter had to pay Union dues. Foreman Larson testified that this letter was "just the clincher, that's all." He said that the letter was in direct violation of the contract between the company and the Union, that it urged a boycott of the non-Union men in the shop, and that he realized that there was just no hope of straightening the man out. Thus there was explicit testimony by the foreman and the night foreman as to the reason for the discharge, and there was undisputed factual foundation for the reason thus given.

The Board says that, since Larson did not have before him at the moment he discharged Van Kralingen a request from the night foreman that he be discharged, he did not discharge Van Kralingen because of complaints by the night foreman. That position is untenable. In the first place, without any contradictory evidence it ignores the unequivocal testimony of Larson, the foreman. In the second place, the complaints of the night foreman, repeated over a considerable period of time, the last one only a few days, possibly a week, before the date of the discharge, would clearly have a cumulative effect on Larson. He so testified. With such a series of complaints and requests for discharge before him, almost any additional incident might be the "clincher". It seems to us wholly untenable to ignore the series of events and, without explicit evidence to support the inference, to infer that only the final event was the cause of discharge.

■ We are of opinion that the finding of the Board that Van Kralingen was discharged because of protected Union activities is not supported by substantial evidence on the record as a whole.

■ We are of opinion that the conclusion of the Board that Tamanaha was discharged because he was no longer a member in good standing of the Union, and pursuant to the Union's demand, is supported by substantial evidence. There was evidence which would have supported a contrary result. The contract required the company to employ a specified number of apprentices and a proportionate number of journeymen in the composing room. The full number of apprentices were already on the roll, so Tamanaha was given a temporary status as a journeyman, his retention in that status being conditioned upon his taking a course of study and qualifying himself as a journeyman. So the prerequisite to his keeping the job was not membership in the Union but was full qualification as a journeyman. But, on the other hand, there was a cancellation of his Union membership and a demand on the company by the Union for his discharge. These facts supported the Board's view of the matter, and they are sufficient.

■ The Board ruled that the company must reimburse all its employees and former employees in the composing room who had paid dues and assessments to the Union. This was on the theory that the contract was unlawful, in that it encouraged employees to join the Union to obtain work, thereby inevitably coercing employees to pay dues and assessments to the Union. Since we find that the contract was not illegal and was not a closed-shop agreement, the premise for the Board's ruling falls. The Board's finding that the payment of dues and assessments to the Union was made a condition of employment is without the slightest semblance of support in the record. This provision of the order, therefore, will not be enforced.

The case must be remanded to the Board for entry of orders not incon-

sistent with this opinion. The cross-petition now before us for enforcement of the order will be denied. Technically one paragraph of that order (dealing with Tamanaha) could be enforced, but it seems to us a less confusing procedure is to cancel that order and enter another limited to the permissible provisions.

Order set aside, and case remanded.