**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NEWS SYNDICATE COMPANY, INC., and New York Mailers' Union No. 6, International Typographical Union, AFL–CIO, Respondents.**

No. 45, Docket 25496.

United States Court of Appeals Second Circuit.

Argued Jan. 12, 1960.

Decided May 20, 1960.

Melvin Pollack, Atty., N. L. R. B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., on the brief), for petitioner.

J. Howard Carter, New York City (Townley, Updike, Carter & Rodgers, and Andrew L. Hughes, New York City, on the brief), for respondent News Syndicate Co., Inc.

Gerhard P. Van Arkel, of Van Arkel & Kaiser, Washington, D. C. (Sidney Sugerman, New York City, George Kaufmann, of Van Arkel & Kaiser, Washington, D. C., on the brief), for respondent New York Mailers' Union No. 6.

Gerhard P. Van Arkel, of Van Arkel & Kaiser, Washington, D. C. (David I. Shapiro, of Dickstein, Shapiro & Galligan, and George Kaufmann, of Van Arkel & Kaiser, Washington, D. C., on the brief), for International Typographical Union, AFL-CIO, amicus curiae.

Before CLARK, HINCKS and WATERMAN, Circuit Judges.

HINCKS, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order [1] which issued as a result of charges filed by a mail room employee of each of two New York newspapers, the New York Daily News, published by News Syndicate Company, Inc., herein called the News, and the Wall Street Journal, published by Dow Jones and Company, Inc., herein called the Journal. The charges were brought [2] only against the News and against New York Mailers Union No. 6, International Typographical Union, AFL-CIO, herein called the Union, with whom, both in 1954 and 1956, the News and the Journal had executed two-year collective bargaining agreements covering their mail room employees.[3] The Board held that these contracts,[4] when read in conjunction with their references to the General Laws of the International Typographical Union, herein called the General Laws, constituted *per se* violations of Section 8(b) (1) (A) and (2), and Section 8(a) (1) and (3) of the National Labor Relations Act of 1947, 29 U.S.C.A. § 151 et seq., by the Union and the News, respectively.

The Board also found that the respondents had, in fact, maintained and enforced unlawful Union security and preferential hiring practices at the News and Journal mail rooms, as a result of which the two complaining employees, Burton Randall, at the News, and Julius Arrigale, at the Journal, were unlawfully discriminated against in their employment. Numerous remedies were ordered, which, however, in view of our conclusions on other dispositive issues, we need not discuss.

We will first deal with those contractual provisions held to be *per se* violative

---

1. The Board's decision and order (which were issued on January 2, 1959; corrected on January 21, 1959; and amended on March 2, 1959) are reported at 122 NLRB 818.

2. Since no charges were filed against the Journal, the Board made no unfair labor practice findings with respect to it.

3. All New York City newspaper publishers subscribed to the 1954 and 1956 contracts, herein attacked as unlawful, and which are more fully described below.

4. The two contracts involved herein are identical in their pertinent provisions and they shall, hereafter, be referred to in the singular.

of the Act. The contract contains nothing which on its face could be said to be violative of the Act. The General Counsel so conceded at the hearing and the Board does not contend otherwise. Rather, it here advances the same argument which was recently rejected by the District of Columbia Circuit. Honolulu Star Bulletin v. N. L. R. B., D.C.Cir., 274 F.2d 567. Because of our substantial agreement with the penetrating and sound conclusion of that court, we shall have less to say on this aspect of the instant controversy than if the argument had not already had such authoritative judicial consideration.

█ The Board's position now is that, notwithstanding the seemingly legal contractual provisions which limit mail room employment to "journeymen and apprentices," who are defined quite innocuously in Section 20–b of the contract and without reference to Union membership,[5] see Evans v. International Typographical Union, D.C.Ind., 81 F.Supp. 675, 686, the contract is illegal because of a clause therein which incorporates those General Laws of the International Union which are "not in conflict with this contract or with federal or state law" to "govern relations between the parties on conditions not specifically enumerated herein."[6]

Certain of these General Laws concededly condition journeyman and apprentice status on Union membership and they further require each local Union to establish Union employment priority

5. Excerpt from Section 20–b:

"* * * Only journeymen and apprentices shall be employed on work covered by this agreement. Apprentices may be employed only in accordance with the ratio of apprentices to journeymen provided elsewhere in this agreement. Journeymen are defined as: (1) Persons who prior to the effective date hereof worked as such in the mailing rooms of papers signatory to this contract; (2) persons who have completed apprentice training as provided in this contract, or have passed a qualifying examination under procedures heretofore recognized by the Union and the Publishers; (3) persons who have passed an examination recognized by both parties to this contract and have qualified as journeymen in accordance therewith. Persons seeking to qualify as journeymen shall be given an examination under nondiscrminatory standards and procedures established by the parties hereto by impartial examiners qualified to judge journeyman competency selected by the parties hereto. In the event agreement cannot be reached on the standards or procedures to be followed, or the examiners to conduct such examinations, the dispute shall be submitted to the Joint Standing Committee whose decision shall be final and binding on the parties."

The General Counsel commented at trial that "My reading of the contract did not indicate that there was any violation with respect to the method by which a person could become a journeyman, at least from the face of the contract. That appeared to be valid as set out in Section 20(b) of the contract."

6. Section 24 of the contract reads:

"Both parties agree that their respective rights and obligations under this contract will have been accorded by the performance and fulfillment of the terms and conditions thereof and that the complete obligation of each to the other is expressed herein. It is understood and agreed that the General Laws of the International Typographical Union in effect January 1, 1955, not in conflict with this contract or with federal or state law shall govern relations between the parties on conditions not specifically enumerated herein."

Section 38 provides:

"*Mutual Guarantees.* Because of the enactment of the Labor-Management Relations Act of 1947 this contract differs from contracts between these parties over a period of many years. It is understood and agreed, however, for the duration of this contract, that if any provision modified from any preceding contract or excluded from this contract solely because of the restrictions of law, no longer is held to be inoperative, either by legislative enactment or by decision of the court of highest recourse, then such provision automatically shall become a part of this contract, to the extent permitted, and be in force and effect as though it had been originally made a part hereof."

The respondents assert without challenge that no union security clause has appeared in a collective bargaining between the parties since 1948.

and seniority systems covering its members.[7] Such conditions, the Board held, unlawfully created discriminatory and coercive conditions. It also held illegal the contractual provisions vesting hiring authority in the mail room foremen, who were required to be Union members in good standing, since, reasoned the Board, such foremen would have to follow, both under the terms of the contract and under their Union oath,[8] the closed-shop and priority and seniority system provisions, of the General Laws. Finally, on the basis of the foremen's hiring authority under the contract and their Union obligations, the Board concluded that, regardless of the unlawful provisions of the General Laws, the News had unlawfully delegated exclusive mail room hiring to the Union, in a fashion incompatible with the expressed standards required by the Board. Mountain Pacific Chapter of the Associated General Contractors, 119 N.L.R.B. 883, 893, 897, enforcement denied, N. L. R. B. v. Mountain Pacific Chapter of Assoc. Gen. Con., 9 Cir., 270 F.2d 425.

■ The respondents [9] raise several serious objections to the Board's conclusion that the contract was illegal on its

7. Extracts from General Laws:
   "Article V—Foremen
   "Section 11: All persons performing the work of foremen or journeymen, at any branch of the printing trade, in offices under the jurisdiction of the International Typographical Union, must be active members of the local union of their craft and entitled to all the privileges and benefits of membership.
   "Article VII—Machines
   "Section 1: * * * None but members [of the ITU] shall be permitted to operate, maintain and service any mailing machinery or equipment when used on work under the jurisdiction of the International Typographical Union. * * *
   "Section 2: In machine offices under the jurisdiction of the International Typographical Union, no person shall be eligible as a 'learner' on machines who is not a member of the International Typographical Union. * * *
   "Article X—Priority
   "Section 2: Subordinate unions shall establish a system for registering and recording priority standing of members in all chapels, which shall be conspicuously posted or kept in a place within the chapel accessible to members at all times. The priority standing of a member shall stand as recorded.
   "Section 5: Any member engaged to serve the International Typographical Union, a subordinate union or to perform work in the interest of the organized labor movement, or any member incapacitated by illness, shall not be deprived of priority standing while so employed or so incapacitated. Such member shall employ while absent the priority substitute competent to perform the work if one is available. The situation holder shall not suffer loss of situation or priority in the event such a substitute is not available. After thirty calendar days the situation shall be filled by priority sub, and considered in the category of a new situation. Upon reporting for duty full priority rights shall be restored.
   "Section 6: Available priority substitute competent to perform the work must be employed on any new situation created because of the absence of a situation holder from his or her situation for more than thirty calendar days, and whose priority is protected under the provisions of other sections of I.T.U. laws or contracts: Provided, Should a substitute with greater priority become available such substitute shall be placed on said situation: Provided, further, Local unions may establish by contract, for the purpose of avoiding multiple changes in preferred shifts and starting times, for the employment of the available priority substitute after thirty calendar days and continuing to, but not more than ninety days from absence of situation holder."

8. The Board points to various provisions in the General Laws and local Union constitution, by-laws and rules which require all Union members to comply with all General Laws and local Union laws. These laws in turn provide for closed-shop and preferential hiring conditions. The Union points to both a 1951 amendment of the General Laws which abolished an oath provision requiring discrimination against nonmembers and a 1953 amendment to the ITU's Constitution which abolished a prior provision requiring all members to accord preference to other members.

9. In addition to the respondents, the International Typographical Union, AFL–CIO, has filed a brief in opposition to the Board's petition, pursuant to this Court's permission.

face. But we find it necessary to go no further than to overrule the Board's holding on the reasoning and on the ground developed in Honolulu Star Bulletin v. N. L. R. B., supra. See also Lewis v. Quality Coal Corp., 7 Cir., 270 F.2d 140. The facts of the case here fall directly within the scope of the Honolulu Star case: the contract here contained no explicit illegal Union security clause and did not purport to incorporate illegal provisions of the General Laws, but only those which were "not in conflict * * * with federal or state law * *" [274 F.2d 569].[10] In this respect the contract is distinguishable from those involved in Red Star Express Lines v. N. L. R. B., 2 Cir., 196 F.2d 78, and other cases relied on by the Board, such as N. L. R. B. v. Gottfried Baking Co., 2 Cir., 210 F.2d 772, and N. L. R. B. v. Gaynor News Co., 2 Cir., 197 F.2d 719, affirmed Radio Officers Union, etc. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455. In such cases, hypothetical language in collective bargaining agreements as to the effect of illegal union security provisions which were explicitly included therein was thought to be insufficient to negate their illegal coercive force. The cases make it plain that in scanning a contract for its possible coercive effect on employees the test is whether the natural and foreseeable consequence of the language adopted is to encourage Union membership. Cf. Radio Officers Union v. N. L. R. B., 347 U.S. 17, 52, 74 S.Ct. 323, 98 L.Ed. 455. We hold this is not such a contract.

■ The Board also held that the contract, by its reference to the General Laws, delegated complete control over seniority matters to the Union, and hence tended to encourage Union membership in violation of the Act. In so ruling, the Board relied upon Matter of Pacific Intermountain Express Co., 107 NLRB 837, enforced as modified, N. L. R. B. v. International Brotherhood of Teamsters, 8 Cir., 225 F.2d 343; see also N. L. R. B. v. Dallas General Drivers, Etc., 5 Cir., 228 F.2d 702.

As to this we think there is a fatal defect in the Board's minor premise, viz., that unrestricted hiring and seniority control was, under the contract, delegated to the Union. Initially, we note that the contract itself does not purport to make such a delegation: on the contrary, it deals specifically with many crucial problems of employee priority and seniority. Thus, under Section 20–a of the contract, the foreman is given hiring authority, but the order of hiring priority and seniority is clearly spelled out with respect to decreasing and increasing the work force.[11] Furthermore,

10. While in the contract before us the term "journeyman and apprentice" is not explicitly defined to exclude nonunion employees, the contract did not, as in the Honolulu case, specifically provide that the term "journeyman and apprentice," was in no way to be interpreted as applying exclusively to Union members. However, we do not read the Honolulu opinion as turning primarily upon that provision. Its real thrust was its rejection of the same incorporation by reference argument here urged. Indeed, in an earlier case before the Board, a trial examiner found similar contractual provisions valid and he rejected the "incorporation by reference theory" here advanced. The Board, at that time, did not object to his ruling. Matter of Kansas City Star Co., 119 NLRB 972.

11. Section 20–a of the contract reads: "The operation, authority, and control of each mail room shall be vested exclusively in the office through its representative, the Foreman. In the absence of the Foreman, the Foreman-in-Charge shall so function. Foremen of Mail Rooms have the right to employ help and may discharge (1) for incompetency, (2) for neglect of duty, (3) for violation of office rules, which shall be kept conspicuously posted, and which shall in no way abridge the civil rights of employees or their rights under accepted International Typographical Union laws, and (4) to decrease the force, such decrease to be accomplished by discharging first the person or persons last employed, either as regular employees or as extra employees, as the exigencies of the matter may require. Should there be an increase in the force, the persons displaced through such cause shall be re-employed in reverse order in which they were discharged before other

under Section 22 the seniority status of employees who are on leave of absence for military and Union reasons is also expressed in the contract.[12] We are, therefore, hard pressed to discover language indicative of a contractual intent to delegate authority to the Union to determine the seniority of even its own members, since it would appear that any General Laws dealing with seniority matters would be "in conflict with this contract," and would not concern "relations between the parties on conditions not specifically enumerated herein."[13] Moreover, under Section 33 seniority controversies, at least those arising out of the contractual provisions, were subject to the contractual arbitration machinery and were not under exclusive Union control.[14]

Even if we were to assume that the contract incorporates those General Laws which provide that local Unions shall maintain priority and seniority lists of their members,[15] we could not accept the Board's conclusion that the parties had thereby delegated exclusive control over seniority matters to the Union. The contract expressly provides that "all disputes arising out of, relating to, or affecting the operation of this contract" are subject to arbitration, and surely seniority disputes would be included therein. The Board's contrary view, which is based upon the fact that the General Laws were not subject to arbi-

---

help may be employed. Upon demand, the Foreman shall give the reason for discharge in writing. The substitute oldest in continuous service shall have prior right in the filling of the first vacancy."

Section 20–b reads:

"The Foreman shall do all the hiring and discharging of all employees engaged in working in the various mail rooms. The Foreman shall have sole authority to issue orders, but he may designate other members to act as Assistant Foremen to direct the work, and all employees shall comply with all such orders issued within the terms of this agreement. Failure to comply shall constitute grounds for discharge."

12. "Section 22–a. *Union Activity.* When any members of New York Mailers' Union No. 6 are on leave of absence from their jobs because of holding office in New York Mailers' Union No. 6, or the International Typographical Union, or performing any service for these Unions, such members shall be returned to their former or similar positions on the expiration of their leave. The Union shall certify to such absence to the Foreman in writing.

"Section 22–b. In cases where employees are admitted as residents of the Union Printers' Home, or who enlist in or are drafted for service in the military or naval services of the United States or the Dominion of Canada (or their allies) in time of war or for the duration of any period of national emergency proclaimed by the governments of said countries or during the time when such armed forces are engaged in active combat with the military forces of another nation which presents a threat to the security of the United States or Canada, or those who may actively engage in war work for the American Red Cross, or other similar accredited agencies, their situations and/or priority standing shall be protected and upon again reporting for duty the situations and/or priority standing formerly held by these employees shall be restored to them."

13. See fn. 6, supra.

14. Section 33–b provides:

"To the Joint Standing Committee shall be referred for settlement all questions which may arise as to the scale of wages, all disputes (except discharge cases) arising out of the operation of this agreement, all disputes regarding the interpretation of any portion of this agreement and any and all disputes (except discharge cases) arising out of, relating to, or affecting the operation of this contract. The Joint Standing Committee must meet within five (5) days from the date on which either party hereto, through its authorized representative, notifies the other party in writing that a meeting is desired and shall proceed forthwith to settle any questions before it. Such decision to be final and binding on both parties to this contract."

Section 33–a provides that the Joint Standing Committee shall be composed of four members; two members to be named by the Publisher, and two members by the Union.

Section 33–c provides for a Board of Arbitration, in case of a deadlock in the Joint Standing Committee, said Board to be composed of the Committee and a fifth, disinterested party.

15. See fn. 7, supra.

tration, is not persuasive, since it would be the local seniority lists rather than the General Laws which would be arbitrated. Finally, the uncontradicted testimony of the Union's president that all controversies dealing with priority and seniority were subject to, and had, in fact, gone to arbitration, indicates that the parties interpreted the contract in conformity with the natural meaning we assign to it.

■■ Our holding that the contract did not provide for a closed-shop largely undermines the foundation for the Board's contention that the contractual provision giving Union foremen hiring authority was, *per se*, an unlawful attempt to maintain closed-shop and Union-controlled hiring practices. The foremen, under the contract at least, were not subject to the conflicting obligations of two masters. Regardless of the Union obligations to which, without more,[16] a foreman would be subject by reason of his Union membership, Section 20–c of the contract specifically provides that: "The Union shall not discipline the foreman for carrying out the instructions of the publisher or his representative in accordance with this agreement." Furthermore, Section 4 provides: " * * * Foremen * * * shall be appointed and may be removed by the Publishers." By these provisions the parties clearly indicated that the foremen are *solely* the employers' agents and that they are under an obligation to act in accordance with the agreement, in spite of Union ties and obligations which otherwise might control. See Evening Star Newspaper Co. v. Columbia Typographical Union, D.C., 141 F.Supp. 374, affirmed 98 U.S.App.D.C. 206, 233 F.2d 697; cf. Evans v. International Typographical Union, supra, 81 F.Supp. at pages 683–684. In any event, there is no presumption of law, we hold, that under the terms of this contract a foreman would be guided by his Union obligations rather than those expressed in the collective bargaining agreement between his employer and the Union. Honolulu Star Bulletin, v. N. L. R. B., supra; Carpenters District Council, etc. v. N. L. R. B., D.C.Cir., 274 F.2d 564.

■ Of course, few would doubt that in practice Union foremen could discriminate against nonunion applicants in the exercise of their hiring power. But a mere power to discriminate is not illegal as even the Board appears to recognize. See Evans v. International-Typographical Union, supra, 81 F.Supp. at pages 684–685; cf. Chicago Rawhide Mfg. Co. v. N. L. R. B., 7 Cir., 221 F.2d 165, 170; Coppus Engineering Corp. v. N. L. R. B., 1 Cir., 240 F.2d 564, 572, 574. Indeed, such recognition is implicit in the Board's order which prohibits the News and the Union from requiring mail room foremen to be Union members *only until such foremen are directly advised by the Union* that they can disregard those provisions of the General Laws which call for closed-shop conditions and preferential Union hiring. In the absence of provisions calling explicitly for illegal conduct, the contract cannot be held illegal because it failed affirmatively to disclaim all illegal objectives. N. L. R. B. v. Mountain Pacific Chapter of Assoc. Gen. Con., supra, 270 F.2d at page 431, cf. N. L. R. B. v. Revere Metal Art Co., Inc., etc., 2 Cir., 280 F.2d 96.

■■ Nor can we sustain the Board's finding that irrespective of the closed-shop provisions of the General Laws and the foreman's obligation to follow them, his hiring authority, in fact, vested the Union with exclusive control over hiring. The Board's so-called Mountain Pacific doctrine even if sound is not applicable here.[17] For the News, not unlike nu-

16. See fn. 8, supra.

17. N. L. R. B. v. Mountain Pacific Chapter of Assoc. Gen. Con., supra; N. L. R. B. v. Swinerton & Walberg Co., 9 Cir., 202 F.2d 511, certiorari denied 346 U.S. 814, 74 S.Ct. 24, 98 L.Ed. 455; N. L. R. B. v. International Association of Heat and Frost Insulators, etc., 1 Cir., 261 F. 2d 347; Eichleay Corp. v. N. L. R. B., 3 Cir., 206 F.2d 799; cf. Morrison-Knudsen Company, Inc., etc. v. N. L. R. B., 2 Cir., 276 F.2d 63.

merous other employers, merely placed its hiring powers in the hands of its principal employee, the foreman who discharged that responsibility on the employer's premises. The News, like any other employer, is of course entitled to employ only Union foremen, if it so desires. Sections 2(3) & (11), 14(a) of the Act, 29 U.S.C.A. §§ 152(3) & (11), 164(a); Carpenters District Council, Etc. v. N. L. R. B., supra; cf. A. H. Bull Steamship Co. v. National Marine Engineers Beneficial Ass'n, 2 Cir., 250 F.2d 332. But, as we have already noted, the foreman's prime allegiance and responsibility was owed to his employer and to the terms of the collective bargaining agreement. We are unable to discover any reasonable ground of support for the conclusion that these hiring conditions would lead an employee to legitimately assume, regardless of the actual operations of the arrangement, that his employment opportunities depended upon his Union membership.

We conclude, accordingly, that the parties did not violate the Act by the mere execution and the maintenance of the collective bargaining contract.[18]

The Board also found that quite apart from the supposed illegality of the contract the respondents had in practice maintained and enforced closed-shop and preferential hiring conditions at the News and Journal through their apprenticeship and competency systems, which we will presently describe. The essence of its position is that respondents maintained a system whereby only Union members could obtain permanent mail room employment, and whereby such members were favored over nonmembers in the "shape-up" hiring for other jobs.

The employment practices thus impugned were substantially as follows. Full time employees, known as "regular situation holders," form the bulk of the mail room labor force and they are not required to "shape" for work, i. e., to be hired on a day-to-day basis. The record indicates, without apparent exception, that such employees are all both journeymen and Union members, although, for aught that appears, their Union membership antedated the passage of the Taft-Hartley Act. The foreman frequently exercises his hiring authority in order to both provide replacements for absent regular situation holders and increase the labor force when increases are needed. The first group to which he turns is that composed of men termed "regular substitutes." These men are available daily to supplement the regular work force of any single publisher and although they are not guaranteed five work shifts per week they normally work that often. It appears that each of them is also both a journeyman and a Union member. The Union "chapel" chairman,[19] maintains a priority list of these regular substitutes, whose priority is determined by the date on which they commence work with a particular employer, and that date is indicated by the deposit of their Union card with the chapel chairman. Regular substitutes are hired by the foreman in the order in which their names appear on this list.

If, as is quite often the case, the size of the day's newspaper requires the employment of additional mailers, the foreman next hires from men who shape the shop "regular situation holders" and "regular substitutes" from other newspapers, in preference to "other extras." The Board describes such "other extras" as "non union shapers" and the Union terms them "casuals without journeyman status." These conflicting descriptions point up the nub of the dispute. The record indicates that many of these "other extras," including the two whose com-

18. Because of our holding herein, we need not pass upon the Union's claim that the Board's concession that the respondents entered into and administered the contract in good faith precludes findings of violations of §§ 8(a) (3) and 8(b) (2).

As to this, each side invoked Radio Officers Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455.

19. The "chapel" chairman is equivalent to a shop steward and each publisher's mail room constitutes a "chapel."

plaints initiated these proceedings, are men engaged in full-time occupations outside the newspaper industry who shape either irregularly or regularly, but at infrequent intervals throughout the week. Thus ostensibly, at least, the hiring procedures are based upon nondiscriminatory contractual criteria, i. e., competency as evidenced by journeyman status, and seniority based upon length of employment as a journeyman with the hiring employer and as a journeyman elsewhere in the industry.[20] And the respondents persuasively contend that thus to accord priority in the hire of extras to men who regularly work for the employer as well as to men who have journeyman status with other employers, is entirely consistent with lawful hiring based upon competency and legitimate employee qualifications quite apart from Union membership.

The Board, on the other hand, strongly urges that since outside Union men are always given shaping preference, even if they have never previously worked at the particular hiring shop, as against all nonunion shapers, including those who have shaped at that shop for many years, unlawful discrimination is proved. It insists that the apprenticeship and competency systems are nothing but camouflage to conceal and perpetuate accomplished discrimination. We turn, therefore, to a consideration of these systems.

Two routes were open to a mail room employee who desired to achieve journeyman status—he could either complete an apprentice training program or he could pass a competency examination. While it is true that apprentices were hired by the foremen,[21] as we said above the contract did not place the hiring authority in the Union. Nor does the record indicate any discriminatory practices in the actual hiring of apprentices.[22] Section 20–b of the contract provided that the qualifying examination for prospective journeymen was to be given "by impartial examiners qualified to judge journeyman competency selected by the parties hereto."[23] The examinations were given, in fact, by a committee composed of Union officials and mail room foremen. The only concrete evidence of the manner in which this testing system operated is the incident which led to the filing of charges by Burton Randall, a nonunion extra at the News.

In the spring of 1956 the News, along with other New York City newspaper publishers, concurred in a Union-initiated plan which contemplated the promotion to "regular substitute" status of those extras (none of whom were apprentices) who had earned 15 vacation credits in 1954 and 1955. Such a vacation credit standing indicated that a man had averaged almost three days' work per week. The Union hoped that its members might perform the increased volume of mail room work which had become available in the New York mail rooms. The News accepted the plan and the proposed objective standard of 15 days' vacation credits, allegedly because it recognized the need for additional

---

20. However, the order of hire among regular situation holders and regular substitutes from other papers was first that of men who had not had five days' work that week and next that of men who had already worked five days.

21. We note, however, that while under Section 20–b of the contract the foreman was to hire and discharge all employees, still Section 27–b provided that a Joint Apprenticeship Committee, composed of an equal number of Union and employer representatives, was to have jurisdiction over all provisions affecting apprentices and was to have control over and responsibility for the selection of apprentices.

22. The record shows that the Union has occasionally requested and received employer permission to shorten the prescribed six-year apprenticeship program. This permission was allegedly given on several occasions when an employer needed additional journeymen. In any event, all apprentices were required to pass the same competency examination as other applicants for journeyman's status, and under Section 27–b of the contract (see fn. 21, supra) any question affecting apprentices upon which the Joint Apprenticeship Committee could not agree was subject to arbitration.

23. See fn. 5, supra.

"regular substitutes." It reasoned that the prospective selectees, who had demonstrated frequency of employment over a considerable period of time, would add the greatest available regularity, dependability and competency to the regular work force. Approximately sixty nonunion men shaped at the News. Of these thirty-one met the proposed standard and were made regular substitutes after they had each passed the journeyman's competency examination. Thereafter, each of the new regular substitutes was hired prior to Randall, although he had shaped at the News for over ten years, which was longer than thirty of them. Randall's full-time outside occupation prevented him from shaping except on Friday and Saturday evenings but his work on these nights while regular was insufficient to give him the 15 days' vacation credit.

The Board found that as a result of these practices Randall, who continued to shape regularly on Friday and Saturday evenings, worked later hours, performed more difficult work, and lost overtime pay. It also found that Randall was denied employment on one Sunday evening, as a result of a Union reprisal against him for his filing of unfair labor practice charges.

We find, however, a dearth of evidence either that a Union journeyman has ever been hired in preference (let alone, an unlawful preference) to a nonunion journeyman,[24] or that the qualifying standards for taking a competency examination are discriminatory. The record is barren of even the slightest hint that there has been discrimination in the conduct of the examinations.[25] Availability, dependability and regularity of service, as well as mere competency, are valid nondiscriminatory considerations in determining the order of hire. The fact that one applicant is as competent as another, does not mean that the other may not properly be preferred on the basis of his other qualifications. And the fact that those achieving status as new "regular substitutes" subsequently became Union members and even indicated their willingness to do so prior to the adoption of the standard, does not indicate, at least on this record, that the standard, seemingly fair, was discriminatory in its effect. Randall admitted that he would have welcomed the opportunity to become a Union member, and for aught that appears in the record, so would the remaining extras who did not meet the established standard.

24. Record statements by Union foremen that they would always hire "outside union men" in preference to "non-union extras" do not demonstrate discriminatory hiring practice in the absence of evidence that they or the Union ever committed, in fact, any discriminatory act in denying employment to a nonunion journeyman. For aught that appears, these were mere predictions of what they would do if the situation ever arose. Local 553, International Brotherhood of Teamsters v. N. L. R. B., 2 Cir., 266 F.2d 552. Furthermore, on the issue of the motivation behind the hiring plan of extras, this testimony, in context, is of scant help, because (1) the expression "outside union men" is continually interchanged with that of "competency" and "journeyman," and (2) due to the lack of nonunion journeymen practically all journeymen were Union members. What is even more important, *no* "non-union extras" *were journeymen* and *all* "outside union men" *were journeymen.*

25. The only offered evidence as to the fate which would await a nonunion man claiming competency who made application for employment as a journeyman, was Union testimony, here unchallenged, concerning past practices under a substantially identical contract between the Printers' Union, New York Typographical Union, No. 6, and the Publishers Association of New York City. Over fifty nonunion journeymen, claiming competency, were allegedly given the identical competency examination as that given apprentices, and while only twenty-six passed, none of those who failed complained of discrimination. Interestingly enough, all of the successful twenty-six applicants went to work prior to their admission into the Union, and while the Union application of one was rejected he remains at work in the trade. See also Evans v. International Typographical Union, supra, 81 F.Supp. at pages 686–687.

We conclude that the record does not warrant a finding that the hiring system in general, or the competency system in particular, by its discrimination against nonunion applicants, encouraged Union membership.

■ This conclusion disposes of Arrigale's charge against the Union. For that charge was based only on a claim of unlawful discrimination inherent in the hiring system. But Randall also charged, and the Board found, a specific act of discrimination which caused him loss of employment on one Sunday night. Concededly, Randall did not work on the night in question. And we should hesitate to sustain a finding based solely on Randall's contradicted testimony, that the foreman had told him that he had been instructed by the Union president to reduce Randall's standing on the list of casual shapers for that night. But there was more than this in the record. There was direct evidence, not contradicted we think, that Randall had long stood first on the list of casual shapers for Friday and Saturday nights and also on the Sunday night immediately preceding the Sunday night in question when, according to his direct testimony, for the first time several extras were put to work ahead of him. We cannot say that it would be unreasonable to infer that this abrupt change in his position on the list was due to the fact that he had shortly before filed charges against the respondents, especially in the absence of any other satisfactory explanation for the change. On the whole, we think the finding of discrimination causing Randall loss of one night's employment was sufficiently supported in the record and constituted a violation of §§ 8(a) (4) and 8(b) (2).

■ We hold, therefore, that we must deny enforcement of the Board's order except so much of it as is based on the finding of unlawful discrimination against Randall which we have just sustained. However, since the exception covers so small a portion of the order, in the interest of clarity we will deny the petition for enforcement *in toto*, and leave it to the Board, if so advised, to enter an order consistent with our opinion. See Honolulu Star Bulletin v. N. L. R. B., supra.

Order set aside and case remanded.