### NATIONAL LABOR RELATIONS BOARD
v.
### CONSTRUCTION SPECIALTIES CO. et al.
### No. 4680.

United States Court of Appeals
Tenth Circuit.
Nov. 4, 1953.

employment to Gordon L. Bundick and Donald Bourbeau because of their non-membership in the Union; and that the Union violated Section 8(b) (1) (A) and 8(b) (2) of the Act by causing Specialties to refuse employment to Bundick and Bourbeau; and by causing Standard Asbestos Manufacturing and Insulating Company (not a party to these proceedings) to refuse employment to Cedric Anderson. The Board issued the usual cease and desist orders and ordered appropriate notices posted; that Specialties and the Union, jointly and severally, make Bundick and Bourbeau whole for any loss of pay suffered because of the discrimination against them; and that the Union make Anderson whole because of its discrimination against him. Specialties admitted the violations and the Board has filed a motion in this court for summary enforcement of its order. The only question here is whether the Union also committed unfair labor practices against the three named employees. The facts found by the trial examiner and adopted by the Board are not materially in dispute.

Frederick U. Reel, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Washington, D. C., and Elizabeth B. Head, Chicago, Ill., on the brief), for petitioner.

Philip Hornbein, Jr., Denver, Colo. (Philip Hornbein, Denver, Colo., on the brief), for respondent.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

This case is here upon petition of the National Labor Relations Board for enforcement of its order issued against Construction Specialties Company and International Association of Heat and Frost Insulators and Asbestos Workers, Local No. 28 A.F.L. The Board found that Specialties violated Section 8(a) (1) and (2) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 158(a) (1) and (2), 61 Stat. 136, by denying

The Master Insulators' Association of Denver is an organization of insulation contractors, of which both Specialties and Standard are members. On July 1, 1948, the Association and the Union entered into a contract governing terms and conditions of employment, to remain in effect for one year unless renewed as therein provided. Under its terms, the employers were obligated to hire Union members in preference to other workers, and nonunion workers only with the permission of the Union. At the end of the one-year term, for reasons not material here, the contract was not renewed. Instead, the parties agreed to continue their relationship pursuant to a "letter of intent", and for the next three years the Association and the Union operated under such "letters of intent". The letters prescribed the wages and other working conditions, but contained no provisions requiring the employment of Union workers and permission of the Union for employing nonunion labor.

During this period, the employers' regular method of hiring was to ask the Union for a certain number of workers for particular jobs and they would be furnished by the issuance of work permits or referral slips. Permits or referrals were issued to nonunion workers only after all available union "card men" and "travelers" (members of other unions) were hired. In an emergency, nonunion workers were occasionally allowed to start work without a permit, provided they obtained one from the Union shortly thereafter. In December 1951, however, the Union revised this referral system by strictly requiring that all workers present a referral slip from the business agent of the Union before starting work. This arrangement was agreed to under protest by members of the Association at a meeting with Union representatives held in January 1952. Discussion at a later meeting, held in March 1952, showed that the members of the Association were concerned with the inconvenience caused by the referral system and that all contractors present at the meeting protested that it was working a hardship, since it delayed getting jobs under way for as much as two days. A member of the Union committee, who later became Union business agent, replied that the referral system was in effect and was going to be carried out. In reply to a suggestion that the members were entitled in an emergency to hire men of their own choosing and have them cleared through the Union, he stated "We do the hiring and we alone."

In February 1951, Bundick applied for a job with Specialties. He was sent to the Union's business agent where he secured a working permit and went to work. Subsequently he applied for membership in the Union but his application was refused. In November 1951, he again obtained a permit from the Union to work for Specialties on a job in Laramie, Wyoming. Upon completion of this job, he was advised by Specialties that they had other jobs available for him if he could obtain a working permit from the Union. He was refused a permit, however, on the ground that all vacancies were being taken up by "travelers". The hiring official at Specialties expressed surprise when Bundick told him of the refusal and telephoned the business agent of the Union, stating that they had been unable to get sufficient workers; that Bundick was a valuable man with experience and they wanted to use him on another job. The permit was still refused and the hiring official explained to Bundick that "because of our working arrangements and agreements with the Union" they would have a strike on their hands if they hired him without clearance from the Union. Bundick has not worked for Specialties or done other commercial insulation work since the Union's refusal to issue a permit.

When Bourbeau was first hired by Specialties in October 1951, he had secured only verbal approval from a representative of the Union as the business agent was out of town. In February 1952, he was again allowed to start to work on the condition that he secure a referral from the Union upon completion of the first day's work. He was issued a referral that evening, but was advised by the Union business agent that the foreman for Specialties should not have permitted him to go to work without the referral, and that he would speak to the foreman about it. When, a short time thereafter, Specialties proposed to transfer Bourbeau to another job, the Union refused to issue him a permit, explaining that they could only put his name on a "waiting list of GI's down at the American Legion" to whom referrals were issued on a rotation system. The hiring officer for Specialties again told the Union agent that they didn't want an untrained man; that they had spent a lot of money training Bourbeau and wanted him for the particular job. The permit was refused and Bourbeau was informed by Specialties that without it they could not hire him. Bourbeau has not worked for Specialties or done any further insulation work since that time.

In April 1951, Anderson was issued a permit by the Union to work for Stand-

ard on a construction job. That job was completed in January 1952 and Anderson sought further employment with Standard. Standard told him he could go to work on May 1 if he could obtain a permit. The Union business agent refused Anderson a permit, stating that he had to put the boilermakers and iron workers who were out on strike, to work first. After such refusal, Standard called the Union business agent on the telephone, requesting additional workers, and specifically asking permission to put Anderson on the job. The agent refused to give a permit to Anderson. When, in response to a request for twelve additional workers, the Union sent only eight men, Standard again asked if Anderson could be put on since he knew how to do the job. The Union agent refused to let Standard employ Anderson, saying he was using Union card men of other crafts to take the place of emergency men.

With qualifications not here material, Section 8(a) (3) of the Labor Management Relations Act makes it an unfair labor practice for an employer to refuse work to an employee because of nonmembership in a labor organization. Section 8(b) (2) of the Act makes it an unfair labor practice for a union to cause or attempt to cause an employer to discriminate against employees in violation of Section 8(a) (3).

It is the contention of the Union that even though the employers practiced unlawful discrimination, it was in no way caused or brought about by the Union. Its position is that it was merely acting as agent of the employers in the hiring of the employees; that the referral system employed by it was in fact a device for the benefit of the employers to enable them to mobilize the supply of asbestos workers; that as a Union acting in such capacity, it had the lawful right to give preference to its own members in filling job vacancies. It is said that although the original contract between the Association and the Union contained illegal provisions, it expired in 1949 before these alleged violations occurred; that there are admittedly no illegal provisions in the "letters of intent", the only express agreement between them; that there must be an express agreement by the employer to hire only union members, and as long as the employer retains freedom to choose his own employees, it cannot be said that the Union has "caused" him to discriminate.

The Union relies on Webb Construction Co. v. National Labor Relations Board, 196 F.2d 841, where the Eighth Circuit refused enforcement on the grounds that the Board's conclusions with respect to the violations were not supported by the evidence. In that case, the employer and the Union agreed to a hiring-hall arrangement, under which the employer would call the Union when it needed employees and the Union would furnish them by work order or referral slip. But there was nothing in the arrangement to justify the Board's conclusion that they agreed to employ only Union members. The court significantly pointed out that as far as the agreement was concerned, the employer was free to hire nonunion laborers at the job site without referral slips from the Union. The facts showed that Kansas City was what is known as a closed-shop town; that about 98% of the common laborers in construction work were members of the union. The union was the logical source of supply for labor and undoubtedly most or all of the laborers employed by the construction company were members of the union. But there was nothing in the record to justify the conclusion that a nonunion laborer would have been denied employment or that the union's consent to such employment was required.

██ Here, however, there is direct evidence to support the Board's conclusion that membership in the Union was a prerequisite to employment. Although there was no written agreement to that effect, the tacit arrangement was enforced quite as effectively. Under the arrangement, the employer was required to hire only employees referred by the Union. This constituted an unfair labor practice, to which the Union was a party.

The Board's order will be enforced.