## NATIONAL LABOR RELATIONS BOARD *v.* NEWS SYNDICATE CO., INC., ET AL.

No. 339.   Argued March 1, 1961.—Decided April 17, 1961.

*Dominick L. Manoli* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Stuart Rothman* and *Norton J. Come.*

*John R. Schoemer, Jr.* argued the cause for News Syndicate Co., Inc., respondent. With him on the briefs were *Andrew L. Hughes* and *Stuart N. Updike.*

*Gerhard P. Van Arkel* argued the cause for New York Mailers' Union No. 6, respondent. With him on the brief were *Henry Kaiser* and *David I. Shapiro.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent union, affiliated with the International Typographical Union, entered into collective bargaining agreements with various publishers, including respondent News Syndicate (and Dow Jones & Co.), which contained a provision that "the General Laws of the International Typographical Union . . . not in conflict with this contract or with federal or state law shall govern relations between the parties on conditions not specifically enumerated herein." The contract limited mail-room employment to "journeymen and apprentices." The contract also provided that mail-room superintendents, foremen, and assistant foremen must be members of the union and that the foremen would do the hiring. The General Laws of ITU provided that "foremen or journeymen" should be "active members" of the union, that only union members should operate, maintain, and service any mailing machinery or equipment, that no person should be eligible as a "learner" who is not a union member.

Another provision of the contract stated, however, that "The Union shall not discipline the Foreman for carrying out the instructions of the Publisher or his representatives in accordance with this agreement." It also provided that the foremen "shall be appointed and may be removed by the Publisher."

The foreman at one plant was a union member and the Board found that he discriminated in favor of union men against a nonunion employee named Julius Arrigale. It

also found that the foreman at another plant was a union member and discriminated in favor of union men and against a nonunion employee named Burton Randall. It concluded that the union and the News Syndicate had violated § 8 (b)(1)(A) and (2) and § 8 (a)(1) and (3) of the National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 136, 140–141, as amended, 29 U. S. C. § 158, respectively, by their contract arrangements and by operating an unlawful closed shop and preferential hiring system.[1] It held that vesting control over

---

[1] Section 8 provides in relevant part:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

.        .        .        .        .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8 (a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . . *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

.        .        .        .        .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided,* That this paragraph shall

employment in union foremen was a delegation of exclusive control over hiring to the union without the requisite safeguards prescribed by the Board in *Mountain Pacific Chapter,* 119 N. L. R. B. 883. The order of the Board contained various provisions including a direction that all employees in the mail-rooms be reimbursed for dues and assessments paid the union for a period beginning six months before the service of the charges against it; and this duty was made, so far as concerns the news mail-room, a joint and several liability of the union and News Syndicate. 122 N. L. R. B. 818.

The Board petitioned the Court of Appeals for enforcement of the order. That court held that the finding of discrimination against Randall was in part supported by the record; and it refused enforcement of the Board's order, allowing the Board, if it wished, to enter an order directed only to that instance of discrimination the Court of Appeals found the record to show. 279 F. 2d 323. The case is here on petition for a writ of certiorari which

---

not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; . . .

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . . ."

Section 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)."

we granted along with No. 340, *International Typographical Union* v. *Labor Board, post,* p. 705, because of the conflict between them. 364 U. S. 877, 878.

What we have this day decided in *Carpenters Local 60* v. *Labor Board, ante,* p. 651, is dispositive of the provision in the Board's order requiring respondents to reimburse union members for dues and assessments.

We also believe the Court of Appeals was right in concluding that the contract on its face is not unlawful even though the foremen—who are union members—do the hiring. In the first place, the contract (unlike the General Laws) does not require journeymen and apprentices to be union members. In the second place, the provisions of the contract which we have set forth make the foremen *"solely* the employers' agents," as the Court of Appeals concluded.[2] 279 F. 2d, at 330. Finally, as we said in *Teamsters Local 357* v. *Labor Board,* decided this day, *ante,* p. 667, we will not assume that unions and employers will violate the federal law, favoring discrimination in favor of union members against the clear command of this Act of Congress. As stated by the Court of Appeals, "In the absence of provisions calling explicitly

[2] The 1947 amendments to the Act changed the ruling in *Packard Motor Car Co.* v. *Labor Board,* 330 U. S. 485, which held that foremen were "employees." Section 2 (3) now excludes from the term "employees" one who is "employed as a supervisor." Section 2 (11) defines a "supervisor" as one "having authority, in the interest of the employer, to hire," etc., employees. Section 14 (a) provides:

"Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this Act shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."

As stated by Senator Taft, under these provisions even a union of foremen could be recognized by an employer, though no employer could be compelled to do so. S. Rep. No. 105, 80th Cong., 1st Sess., p. 5.

for illegal conduct, the contract cannot be held illegal because it failed affirmatively to disclaim all illegal objectives." 279 F. 2d, at 330.

We also agree with the Court of Appeals that the General Laws provision of the contract is not *per se* unlawful. For it has in it the condition that only those General Laws of the union are incorporated which are "not in conflict with this contract or with federal or state law." Any rule or regulation of the union which permitted or required discrimination in favor of union employees would, therefore, be excluded from incorporation in the contract since it would be at war with the Act. We can say with Judge Prettyman in *Honolulu Star-Bulletin* v. *Labor Board,* 107 U. S. App. D. C. 58, 61, 274 F. 2d 567, 570, that while the words "not in conflict with federal . . . law" might in some circumstances be puzzling or uncertain as to meaning, "there could hardly be any uncertainty respecting a closed-shop clause." For the command of § 8 is clear and explicit and the only exception is plainly spelled out in the provisos to § 8 (a)(3).

Whether in practice respondents maintained and enforced closed-shop and preferential hiring conditions raises a distinct question.

The Board's case comes down to the method by which those in the mail-room became journeymen. One could either take an apprentice training program or pass a competency examination. Apprentices were hired by the foremen; but the Court of Appeals found that there were no discriminatory practices in the actual hiring of apprentices. If a person followed the examination route, the contract provided for it to be given "by impartial examiners qualified to judge journeyman competency selected by the parties hereto." The examiners were union officials and the mail-room foremen.

The union proposed and News Syndicate agreed in 1956 to put into the class of a "regular substitute" those

extras who in the prior two years had earned 15 vaca-
tion credits, which was another way of describing those
who had averaged about three days' work a week. Those
who were hired on a day-to-day basis ("shaped for
work") included 60 nonunion men. Of these, 31 were
invited to take the examination. They passed, were made
"regular substitutes," and subsequently became union
members. Thereafter each of the new "regular substi-
tutes" was hired prior to Randall, though he had "shaped"
at the News longer than many of them. Randall, it
appears, had full-time outside jobs that kept him from
"shaping" regularly.[3] Arrigale was a nonjourneyman
who shaped up for the Wall Street Journal, which had
essentially the same hiring setup as the News. The
asserted discrimination occurred when "outside card-
men" were hired in preference to Arrigale, although Arri-
gale was "shaping" steadily and was the oldest nonunion

---

[3] Burton Randall is neither a union member nor a journeyman
within the meaning of the contract between the union and the News.
The hiring practices at the News are as follows: The minimum mail-
ing-room staff ("regular situation holders") are both union members
and journeymen; they report for work each night and are not
required to "shape." To fill in vacancies and to meet added needs,
the foreman next turns to "regular substitutes," who are both jour-
neymen and union members. Next in line of priority are those the
Board insists are referred to as "outside card men," but who are
at any rate both journeymen and union members regularly shaping
up for other newspapers, but available for work on the News. The
lowest priority category consists of what the Board calls "nonunion
shapers" (and the union, "non-journeymen casuals"); at any rate,
these men have neither union membership nor journeyman status.
Within the category, such men are ranked in seniority running
from the date of first shaping up for the News. Burton Randall is a
"nonunion shaper" or "non-journeyman casual." He has been
turning up for the "shaping" at the News for a good many years;
for most of them, he showed only on Fridays and Saturdays since
he held another job. From 1950 to 1956, he was third in seniority
on the "casual" list; from 1956, he was first on that list.

extra. The foreman testified he took "outside card-men" because he could be sure of their competency, because they would have taken the journeyman test or had served as apprentices. There was no evidence that membership in the union was a condition for the journeyman test, save that all journeymen in fact did become union men.

Respondents, therefore, contend that to accord priority in the hire of extras to men who work regularly for the employer (and who also have the journeyman status) is a hiring system based on competency and legitimate employee qualifications.

The Court of Appeals concluded:

"We find . . . a dearth of evidence either that a Union journeyman has ever been hired in preference (let alone, an unlawful preference) to a non-union journeyman, or that the qualifying standards for taking a competency examination are discriminatory. The record is barren of even the slightest hint that there has been discrimination in the conduct of the examinations. Availability, dependability and regularity of service, as well as mere competency, are valid nondiscriminatory considerations in determining the order of hire. The fact that one applicant is as competent as another, does not mean that the other may not properly be preferred on the basis of his other qualifications. And the fact that those achieving status as new 'regular substitutes' subsequently became Union members and even indicated their willingness to do so prior to the adoption of the standard, does not indicate, at least on this record, that the standard, seemingly fair, was discriminatory in its effect. Randall admitted that he would have welcomed the opportunity to become a Union member, and for aught that appears in the record, so would the remaining extras who did not meet the established standard.

"We conclude that the record does not warrant a finding that the hiring system in general, or the competency system in particular, by its discrimination against nonunion applicants, encouraged Union membership." 279 F. 2d, at pp. 333–334.

This finding of the Court of Appeals disposed of Arrigale's complaint and all of Randall's with the exception of the loss of one night's employment as to which the court sustained the Board. The Board drew contrary inferences. But it does not now seriously challenge the foregoing finding of the Court of Appeals. Rather, its main reliance is on the long history of ITU's use of the closed shop, the fact that foremen were union members, and the obscurity of the "not in conflict" clause of the agreement. We think the reversal of the Board on the facts by the Court of Appeals was within the scope of review entrusted to it. See *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, 490–491.

*Affirmed.*

MR. JUSTICE WHITTAKER dissents. See his dissenting opinion in *Carpenters Local 60* v. *Labor Board,* decided this day, *ante,* p. 660.

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring.

I join the Court's opinion on the basis of the reasoning set forth in my concurring opinions in No. 68, *ante,* p. 656, and in Nos. 64 and 85, *ante,* p. 677.

Here, as with respect to the "hiring hall" clause in Nos. 64 and 85, I think the Board's finding that the "General Laws" clause "encouraged" union membership must be accepted. I need only add that in light of the

historic use of such clauses to maintain closed-shop conditions, I would not be willing to overrule the Board's determination that those employed or seeking employment in this newspaper's mail room would regard the innocently worded incorporation of the union's valid "General Laws" as in fact evidencing the employer's and union's intent to allow forbidden union bylaws to govern their relationship as regards employment, until a finding of an unfair labor practice arising therefrom had actually been made.

Mr. Justice Clark, dissenting.

I agree with the Court's disposition of that part of the Board's order requiring respondents to reimburse union members for dues and assessments. However, for the reasons stated in my dissent in Nos. 64 and 85, *ante,* p. 685, I believe that the inclusion in the agreement of the "General Laws" and "Foreman" clauses violated § 8 (b)(1)(A) and (2) and § 8 (a)(1) and (3). I, therefore, dissent from those portions of the Court's opinion.