306 F.2d 35
 J. Francis DRISCOLL, Jr., and Ann K. Driscoll, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Arthur EDELSTEIN and Marian Edelstein, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Lawrence I. COHEN and Myra L. Cohen, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 13664-13666.
 United States Court of Appeals Seventh Circuit.
 July 30, 1962.
 
 Philip B. Heller, Chicago, Ill., for petitioners.
 Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Alec A. Pandaleon, Lee A. Jackson, Harry Baum, Michael K. Cavanaugh, Attys., U. S. Dept. of Justice, Washington, D. C., for respondent.
 Before HASTINGS, Chief Judge, and KILEY and MAJOR, Circuit Judges.
 MAJOR, Circuit Judge.
 
 
 1
 J. Francis Driscoll, Jr. and Ann K. Driscoll, Arthur Edelstein and Marian Edelstein, and Lawrence I. Cohen and Myra L. Cohen (petitioners herein) are husbands and wives who filed their joint income tax returns for the years 1955 and 1956 with the appropriate District Director of Internal Revenue. The Tax Court, after making certain adjustments in the Commissioner's determination, held that petitioners had deficiencies in their income taxes for the years 1955 and 1956. Since the deficiencies in each instance stemmed from the same transaction, the three proceedings have been consolidated. The wives being joined as parties only because they filed joint returns with their husbands, the latter are referred to as the taxpayers.
 
 
 2
 Taxpayers realized gains on the retirement of certain corporate notes. In their returns these gains were treated as long-term capital gains, relying on Sec. 1232 (a)(1) of the Internal Revenue Code of 1954. (Title 26 U.S.C.A. § 1232 (a)(1).) Respondent denied them this treatment on the premise that such gains were taxable as ordinary income.
 
 
 3
 The Tax Court (37 T.C. 52) decided in favor of respondent's position. The cases are here on petitions by the taxpayers for a review of that decision. The findings of fact as made by the Tax Court are not in dispute. A brief statement of such facts will suffice to bring into focus the issue for decision.
 
 
 4
 Ellis Brothers of Illinois, Inc. and South Shore Liquors, Inc. were Illinois corporations, the former chartered in January 1948, and the latter in February 1946. Both had their principal places of business in Chicago and operated as wholesale dealers in wines and liquors.
 
 
 5
 In July 1953, Ellis Brothers for value received executed and delivered its 4% demand promissory note in the sum of $49,736.61, to two of its principal stockholders, Julius and Albert E. Ellis. This note had no interest coupons attached nor was it in registered form. On December 15, 1953, the three taxpayers purchased the note for $3,500, which was endorsed by the Ellises, "Without Recourse pay to the order of" Driscoll, Edelstein and Cohen.
 
 
 6
 The outstanding capital stock of Ellis Brothers of Illinois, Inc. was acquired on December 15, 1953, by South Shore Liquors, Inc., and on March 1, 1954, pursuant to a statutory merger, Ellis Brothers survived and was then renamed South Shore Liquors, Inc. (sometimes called new South Shore Liquors, Inc.).
 
 
 7
 On February 28, 1955, the note for $49,736.61 was surrendered to new South Shore Liquors, Inc., which in turn issued three separate notes, one to each of the taxpayers, all dated February 28, 1955 and each in the amount of $16,578.87, payable on demand with interest at 4% per annum. The face amount of each of these new notes represented one-third of that of the surrendered note.
 
 
 8
 On April 7, 1955, new South Shore paid $6,578.87 on each of the new notes. The remaining balance of $10,000 on each was paid December 28, 1956, when all were retired and cancelled. The gains realized from these payments are those involved in the controversy before us.
 
 
 9
 In brief summary, we have a situation where a note was issued in July 1953 by one corporation payable to Julius and Albert Elis, purchased by the three taxpayers on December 15, 1953, and after certain corporate mergers surrendered to a new corporation which, on February 28, 1955, issued three separate notes, each in one-third of the amount of the old note and each payable to one of the three taxpayers.
 
 
 10
 Respondent, in his statement of contested issues and at other places in his brief, characterizes the transaction as a "substitution" of the new notes for the old. While this terminology may or may not be important, it is well to point out that the Tax Court found:
 
 
 11
 "On February 28, 1955, the note [referring to the old note] was surrendered to new South Shore and it issued three separate notes dated February 28, 1955 * * *." The controlling section of the Internal Revenue Code which must be given effect is as follows:
 
 
 12
 "Sec. 1232. Bonds and other evidences of indebtedness
 
 
 13
 (a) General rule. — For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof —
 
 
 14
 (1) Retirement. — Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954)."
 
 
 15
 Respondent on brief, referring to this section, states:
 
 
 16
 "With regard to obligations issued subsequent to January 1, 1955, Section 1232(a)(1) of the 1954 Code provides that the amounts received on retirement shall be treated as if received in exchange for the obligations regardless of whether or not they were issued in registered form with coupons. With respect to obligations issued prior to January 1, 1955, however, the section extends such treatment only to those obligations issued in registered or coupon form or put in such form by March 1, 1954."
 
 
 17
 This statement contains the word "obligations" four times. The statutory provision, however, contains no such word but employs the phrase, "evidences of indebtedness." Substituting this statutory phrase for the word "obligations," we agree with the statement.
 
 
 18
 Thus, we have for decision the narrow question as to whether the three new notes, the "evidences of indebtedness," retired by the taxpayers and upon which they realized a gain, were issued on February 28, 1955, the date they bear, or in July 1953, the date of the old note.
 
 
 19
 We assume, in fact taxpayers on brief appear to concede, that the indebtedness witnessed by the old and by the new notes was the same. There is a distinction, however, between an indebtedness and the "evidences of indebtedness," as the statutory provision so meticulously recognizes. The date of the old was different from that of the new notes. The obligor in the old note was different from that in the new notes. The old note designated two parties as payees; the new notes each designated one party as payee. The old note upon surrender was without value or utility; it was worthless. It was no longer an evidence of indebtedness. Upon issuance of the new notes, they became the "evidences of indebtedness."
 
 
 20
 The Tax Court, as noted, found that the new notes were issued February 28, 1955, which being subsequent to January 1, 1955, entitled the taxpayers under the statute to the preferential capital gains treatment. However, the Tax Court reasoned and respondent argues that Congress did not intend that which it so specifically provided. In order to escape this dilemma, the Tax Court reasoned, "When the section is read as a whole, it is obvious that in the parenthetical exception of section 1232(a)(1) the word `issued' means `initially issued.'" This result is reached on the claim that the statute is ambiguous and, therefore, subject to construction in accordance with the intention of Congress. With this reasoning we do not agree.
 
 
 21
 The statute, so far as it relates to the point under discussion, is perfectly clear. If Congress had intended that the date of the "evidences of indebtedness" be carried back to the date of the issuance of the original note, we think that it was capable of employing language appropriate to accomplish that purpose. The Commissioner, in McClain v. Commissioner, 311 U.S. 527, 530, 61 S.Ct. 373, 85 L.Ed 319, made a contention similar to that advanced here and in response thereto the Court stated:
 
 
 22
 "The answer is that we must apply the statute as we find it, leaving to Congress the correction of asserted inconsistencies and inequalities in its operation."
 
 
 23
 The involved provision is written in language so plain and unambiguous that there is no room for its construction or interpretation and we find no occasion to discuss cases cited by respondent in this respect. For the same reason, the legislative history of the provision so strongly relied upon by respondent and the Tax Court, as it bears upon congressional intent, could well be dismissed. However, a study of this history is convincing that it supports the contention of the taxpayers and not that of respondent. Senate Report No. 1622, 83rd Congress, 2nd Session (3 U.S.C. Cong. & Adm. News (1954) pp. 5076-5077) discusses the purpose and effect to be given the provision. The purpose was to overcome a defect in Sec. 117(j) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(j), as construed in Lurie v. Commissioner, 9 Cir., 156 F.2d 436.
 
 The report among other things states:
 
 24
 "Redemption of all bonds and other evidences of indebtedness will receive capital gain or loss treatment on redemption if issued after December 31, 1954, and if they are otherwise capital assets * * *."
 
 
 25
 That statement is entirely consistent with the language of the provisions that "evidences of indebtedness" issued after January 1, 1955 are entitled to the long-term capital gains treatment.
 
 
 26
 The Senate Report, also consistent with the statute, provides that "evidences of indebtedness" issued prior to January 1, 1955, without interest coupons and not in registered form, must have been put in registered form by March 1, 1954, in order for their retirement to be treated as a sale or exchange so as to be entitled to capital gain treatment.
 
 
 27
 Respondent in his brief asserts that the report states "explicitly that nonregistered, noncoupon bonds `must be in registered form on March 1, 1954 in order for their retirement to be treated as a sale or exchange.'" That statement is true only to the extent that it applies to bonds or other evidences of indebtedness issued prior to January 1, 1955. Evidences of indebtedness issued subsequent to that date, as the Senate Report states and the statute provides, upon redemption are entitled to capital gains treatment.
 
 
 28
 The concluding statement in respondent's brief emphasizes that the only issue in the case is whether the "evidences of indebtedness" were issued on February 28, 1955 or in July 1953. It states:
 
 
 29
 "The notes of the taxpayers having been issued prior to January 1, 1955, and not being in registered or coupon form on March 1, 1954, the amounts received on retirement were received not in exchange therefor, and, accordingly, the gain was not gain from sale or exchange of a capital asset."
 
 
 30
 In view of our conclusions that the three new notes as "evidences of indebtedness" were issued on February 28, 1955, it follows that the contention of respondent must be rejected.
 
 
 31
 Respondent in a footnote suggests that even though we disagree with the decision of the Tax Court, the case should be remanded for consideration of an alternative contention advanced before the Tax Court. This alternative contention, as we understand, is based on the premise that it is the position of the taxpayers that the notes issued February 28, 1955 were for a newly created indebtedness. The Tax Court in its decision makes no mention of such alternative theory, due we suspect to the fact that the Court considered it without merit. In any event, the contention is based upon the false premise that it is the position of the taxpayers that a different indebtedness was created by the issuance of the new notes. The taxpayers make no such contention in this Court and, as far as we are aware, did not do so in the Tax Court. Furthermore, as we have previously noted, it is our view that the indebtedness remained unchanged; it was the evidence thereof which was changed by the issuance of new notes on February 28, 1955. We think there is no sound reason to remand the case on a theory so nebulous and apparently without merit.
 
 
 32
 The decision of the Tax Court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.