**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHERN STEVEDORING AND CONTRACTING COMPANY, Respondent.**

No. 20893.

United States Court of Appeals Fifth Circuit.

June 17, 1964.

Rehearing Denied July 30, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

M. L. Cook, Houston, Tex., for respondent.

Before HUTCHESON, PRETTY-MAN * and JONES, Circuit Judges.

PRETTYMAN, Senior Circuit Judge:

This is a petition filed by the National Labor Relations Board for enforcement of an order which held the Southern Stevedoring and Contracting Company to be in violation of Section 8(a) (1) and (3) of the National Labor Relations Act.[1] The pertinent provisions of the statute are:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise

of the rights guaranteed in section 7;

\*   \*   \*   \*   \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: \* \* \*."

Effective October 1, 1956, the respondent Company, together with numerous others, entered into an agreement covering all ports in Texas in respect to wages and working arrangements for labor to be performed in the loading and unloading of deep-sea vessels. The contract provided for the operation of hiring halls through designated Locals of the International Longshoremen's Association. The provision was that the contracting companies would employ the necessary labor to perform all longshore work through these hiring halls. In April, 1947, the Port of Texas City was totally wrecked by an explosion. Deep-sea traffic resumed at that Port, so far as this record shows, in mid-1958. The events with which we are concerned occurred in October, 1958. At that time there were two rival unions among the longshoremen, the one already mentioned, which we shall call the ILA, and the other the International Brotherhood of Longshoremen, which for ease of identification we shall call the Brotherhood. The rivalry was bitter.

The walking foreman for the Company in its coastwise operations at Texas City during the recent-prior period had been one James I. Fagg, Sr. Fagg was then president of two Locals of the Brotherhood. When the ocean-going S/S Rebecca was expected to dock at Texas City, the president of the Company, one Harris, told Fagg that he (Fagg) was wanted as walking foreman in handling that ship, but that the longshoremen, checkers and timekeepers would have to come from the ILA, "orders" to that effect having been received from the secre-

---

* Senior Circuit Judge of the District of Columbia Circuit, sitting by designation.

1. 49 STAT. 452 (1935), as amended, 29 U.S.C. § 158(a) (1) and (3)

tary of the ILA District. A discussion ensued, during which several meetings were held, one at the office of the Mayor of the town. Fagg insisted that the work be split fifty-fifty between the ILA and the Brotherhood. Harris agreed, upon condition that the ILA officials approved. These officials refused, the Mayor reporting that the head of one of the ILA Locals said that "under no circumstances could they split the work; they were going to have the whole hog or none." Harris then said that all hiring would be done through the ILA. Fagg never worked for the Company again.

When the Rebecca docked, some forty or fifty members of the Brotherhood appeared at the shapeup, which is the process of selecting workers from among those who apply. Out of the more than two hundred longshoremen, etc., hired on the Rebecca and two other ships which subsequently docked, only two or three Brotherhood men received employment. It appears that one of them was hired by a foreman friend and another had been referred by a carpenters union. Three individuals resigned from the Brotherhood and obtained work through the ILA. A gang foreman testified that he "picked up" ILA members for his gang before he picked up anyone else.

■■ The first question before us is whether the contract between the Company and the union was illegal *per se.* The hearing examiner, acting in accordance with decisions of the Board, held the contract to be illegal. After his intermediate report, but before the consideration by the Board, the Supreme Court decided the Local 357 [2] and News Syndicate [3] cases. Under those cases it is clear that this contract, very similar to the contracts there involved, is legal upon its face. The Board so held. However it is also clearly established that, if an employer vests a union with sole power to hire in his behalf, he is responsible for the hiring practices of the union if he knows, or should know, what those practices are.[4]

■ The Board found as a fact that the Company, through its acquiescence in the practices of the union, had discriminated in regard to the hire of employees. The evidence, which we have indicated without reciting in full, is clear that the officials of the ILA and the gang foremen operating under its direction hired ILA members in direct preference to Brotherhood members and that this selection was due to union membership. The evidence is also clear that the Company, through its president, Harris, knew of the policy and program of the ILA. It would have been naive for the Board to conclude from the facts in the record that the Company, through Harris, did not know and had no compelling reason to surmise that the ILA, in the operation of the hiring hall, was preferring its own members. Harris knew of the conflict between the two unions. He was involved in negotiations with them and was advised in no uncertain terms that under no circumstances would the ILA share the work with the Brotherhood. If he had taken a look at the shapeup he would have witnessed it; the members of the different unions wore identifying buttons. The ensuing discrimination was both wholesale and notorious. Thus the finding of the Board is amply supported by evidence in the record. The situation described falls squarely within the provisions of the statute, in that the employer by discrimination in regard to hire encouraged membership in a labor organization.

Alleged discrimination in respect to five named individual applicants for work as longshoremen with the Company in

2. Local 357, International Brotherhood of Teamsters, etc. v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961).

3. NLRB v. News Syndicate Co., 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29 (1961).

4. See NLRB v. Lummus Co., 210 F.2d 377 (5th Cir. 1954); NLRB v. United States Steel Corp., 278 F.2d 896 (3d Cir. 1960); NLRB v. George D. Auchter Co., 209 F. 2d 273 (5th Cir. 1954); NLRB v. Construction Specialties Co., 208 F.2d 170 (10th Cir. 1953).

the unloading of the three vessels here involved was also included in the complaint and in the order of the Board. The Board found specifically, as did the hearing examiner, that these five individuals were discriminatorily refused employment by the Company, in violation of the Act. They were all members of the Brotherhood. These findings are amply supported by evidence in the record. The Board's order will therefore be

Enforced.