**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SHEET METAL WORKERS INTERNA-TIONAL ASSOCIATION, LOCAL NO. 65, AFL-CIO, Respondent.**

**No. 16370.**

United States Court of Appeals Sixth Circuit.

April 26, 1966.

Michael R. Brown, N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack, Atty., N.L.R.B., Washington, D. C., on brief, for petitioner.

Arlene B. Steuer, Cleveland, Ohio, Cozza & Steuer, Cleveland, Ohio, on brief, for respondent.

Before EDWARDS AND CELE-BREZZE, Circuit Judges, and McALLIS-TER, Senior Circuit Judge.

EDWARDS, Circuit Judge.

The National Labor Relations Board seeks enforcement of an order finding respondent union guilty of an unfair labor practice by causing an employer to discharge two men. The order also required that those two employees be returned to their jobs.

This problem arose in September of 1963 when the International Union, to which Local 65 belongs, instituted a requirement that all the members pass a test for qualification as sheet metal workers.

This test was administered by union representatives of Local 65. The respondent company did not agree to this procedure and did not participate in the test. Two employees in the company's manufacturing division did not pass the test; one because he failed it; the other because he did not take it.

The Union thereupon notified the company of these facts and the company was advised by letter: "According to the agreement between your company and Local No. 65, these men are to be required to be members of Local No. 65 as a condition on [sic] continued employment."

The reference here and in other written and oral Union communications on this topic was to paragraph 3 of the labor-management agreement which provided:

"(3) The Employer agrees to require membership in the Union, as a condition of continued employment, of all Employees performing work specified in paragraph #2, of this Agreement, within 31 days following the beginning of such employment, providing the Employer has reasonable ground for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership."

When the company took the position that it was satisfied with the work of the two employees involved, and would not discharge them, negotiations with the Union followed during which strike threats were made and then denied. On the day of these discussions, the two men were discharged. The record leaves in dispute at what point the discharges occurred in terms of time of day and stage of negotiations.

After unfair labor practice complaints against both employer and the Union and a hearing, the Trial Examiner found "Local 65 caused Nabakowski to discharge Pastor and Vaughan in violation of Section 8(a) (3) of the Act. * * *" Further, the Trial Examiner found that the discharges were occasioned in violation of 8(b) (1) (A) and (2) of the National Labor Relations Act.

Section 8(b) (2) provides as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\*  \*  \*  \*  \*

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *." 61 Stat. 141 (1947), as amended, 29 U.S.C. § 158(b) (2) (1964).

Unfair labor practice violations were also found against the employer who chose not to file exceptions and who put the two discharged employees back to work. The National Labor Relations Board affirmed the Trial Examiner's findings and recommended order in all respects relevant to this petition.

Respondent union contended before the Board and contends here that the Trial Examiner's finding that respondent caused the discharge of the two em-

ployees is unsupported by the record and that the Trial Examiner's specific findings of fact were not definitive enough to support his ultimate conclusion.

■ We have reviewed the testimony of all the witnesses. While there is conflicting evidence on several relevant points, there is also substantial evidence to support the basic finding of fact of the Trial Examiner and the Board as to the cause of the discharges. In such a situation this court cannot properly reverse the fact findings of the body statutorily appointed for that task. N.L.R.B. v. Universal Camera Corp., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Respondent's second position in opposing the Board's petition for enforcement of its order is that it had a lawful right to "request the termination of the employee under a union shop labor agreement" when the employee failed the Union's "objective nondiscriminatory test."

It should be noted that the NLRB does not dispute the Union's obvious right to require such a test for its own membership. Houston Typographical Union No. 87, ITU, 145 N.L.R.B. 1657, 1663 (1964). Nor does the NLRB question that the company in agreement with the Union could have required such a test as a prerequisite to employment. New York Typographical Union No. 6, ITU, 144 N.L.R.B. 1555 (1963), enforced sub nom., Cafero v. N.L.R.B., 336 F.2d 115 (C.A. 2, 1964). See also: N.L.R.B. v. News Syndicate Co., Inc., 279 F.2d 323 (C.A. 2, 1960), aff'd, 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29 (1961).

It is the unilateral requirement of this test by the Union and (as the Board found herein) the use of a Union security clause to cause an unwilling employer to discharge which is at issue.

On this topic the respondent union points to Article 2 of the collective bar-gaining agreement as authority for its actions:

"(2) The Employer agrees that none but journeymen sheet metal workers shall be employed on any work obtained for fabrication and for erection by this Department."

It also cites to us 29 U.S.C. § 158(f) [1] which provides in part:

"It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) because * * * (4) such agreement specified minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area." 73 Stat. 545 (1959), 29 U.S.C. § 158(f) (1964).

■ Article 2 of the agreement does not, however, authorize restricting employment to those employees who take and pass a unilateral union administered test for qualification as journeymen. And the last proviso in the statutory language of Section 8(f) specifically says: "Provided that nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section."

The basic statutory language of Sec. 8 (a)(3) makes it an unfair labor practice for any employer to encourage or dis-

---

1. In this case we assume without deciding that the manufacturing operations of this employer are within the application of this section to "the building and construction industry." See N.L.R.B. v. W. L. Rives Co., 328 F.2d 464 (C.A.5, 1964).

courage membership in any labor organization, but provides for an employer to have a right to make an agreement with a union to require union membership as a condition of employment provided:

"That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *." 61 Stat. 141 (1947), 29 U.S.C. § 158(a) (3) (1964)

This record contains a stipulation that neither of the two discharged employees was denied membership in respondent union "because of failure on his part to pay the dues and initiation fees uniformly required as a condition of * * * membership. * * *"

And, obviously, the two discharges would tend to encourage membership in the union. We do not believe that the testimony reveals that respondent was merely engaged in challenging the journeyman qualifications of the two discharged employees under Article 2 of the agreement. The repeated references to the Union security provisions of the agreement, plus business agent Wargo's testimony relating to the unilateral character of the test, make this clear:

"Q There was a difference of opinion as to who should give the test, and whether the Company could give it and whether you would be willing to give the Company a copy of the test, is that correct?

"A No, there was no difference of opinion on it. He asked for permission to give the test.

"Q And you said that permission could not be given?

"A No. I said that it was our Union and we would give the test.

"Trial Examiner: And you would determine the candidates qualifications to be a member of the Union?

"The witness: Yes.

"Q (By Mr. Daley) Based upon the test?

"A That is correct."

As we have pointed out, the Board's finding and order relied upon language in Sec. 8(b) (2) previously quoted. At the time of the adoption of this language by Congress, the House Conference Report gave this explanation of its purpose:

"(1) Section 8(b) (2) is expanded so as to prohibit all attempts by a labor organization to * * * cause an employer to discriminate against an employee in violation of section 8(a) (3). The latter section, as heretofore explained, prohibits an employer from discriminating against an employee *by reason of his membership or nonmembership* in a labor organization, except to the extent that he obligates himself to do so under the terms of a permitted union shop or maintenance of membership contract." (Emphasis in original) Comment, Discrimination and the NLRB, 32 U.Chi.L.Rev., 124, 139 (1964).

The United States Supreme Court has dealt authoritatively with the problem of interpretation of Congressional intent in the adoption of this section and section 8(a) (3) to which it refers.

"The policy of the Act is to insulate employees' jobs from their organizational rights. Thus §§ 8(a) (3) and 8(b) (2) were designed to allow employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood. The only limitation Congress has chosen to impose on this right is specified in the proviso to § 8(a) (3) which authorizes employers to enter into certain union security contracts, but prohibits discharge under such contracts if membership 'was

not available to the employee on the same terms and conditions generally applicable to other members' or if 'membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership'. Lengthy legislative debate preceded the 1947 amendment to the Act which thus limited permissible employer discrimination. This legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees. Thus Congress recognized the validity of unions' concern about 'free riders,' i. e., employees who receive the benefits of union representation but are unwilling to contribute their share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason. Thus an employer can discharge an employee for nonmembership in a union if the employer has entered a union security contract valid under the Act with such union, and if the other requirements of the proviso are met. No other discrimination aimed at encouraging employees to join, retain membership, or stay in good standing in a union is condoned." (Footnotes omitted). Radio Officer's Union of Commercial Telegraphers Union, AFL v. N.L.R.B., 347 U.S. 17, 40–42, 74 S. Ct. 323, 335–336, 98 L.Ed. 455 (1954).

See also N.L.R.B. v. Animated Displays Co., 327 F.2d 230 (C.A.6, 1964).

In view of the fine line of distinctions which have been drawn in relation to permissible and impermissible conduct of unions in this area,[2] we specifically re-

strict our holding in this case to the facts upon which it was decided. We hold that there was substantial evidence that respondent caused an unwilling employer to discharge two employees for failing (or failing to take) a unilaterally administered union qualification test not provided for in the labor management agreement in violation of Sec. 8(b) (2) of the National Labor Relations Act.

The petition of the National Labor Relations Board for enforcement of its order is granted.

---

**2.** Local 357, International Brotherhood of Teamsters, etc. v. N.L.R.B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) ; Labor Board v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963) ; N.L.R.B. v. News Syndicate Co., Inc., supra; N.L.R.B. v. Miranda Fuel Co., Inc., 140 N.L.R.B. 181 (1962), enforcement denied, 326 F.2d 172 (C.A.2, 1963).