949 F.2d 276
 138 L.R.R.M. (BNA) 2884, 60 USLW 2404,
120 Lab.Cas. P 11,006
 E.G. & H. INC., dba Las Vegas Club; Scott Corporation, dba
Union Plaza Hotel & Casino, J.D. Fiorito, Paul Fiorito,
Elmer Detore, U.L. Merlino, Ernest Feruillo, Juanita Nevone,
Calvin Tischer, George Morini, Craig I. Ghelfi, and Jack R.
Picardo, dba Golden Gate Hotel and Casino, Petitioners,
Culinary Workers Union Local No. 226; Hotel Employees &
Restaurant Employees International Union, Local
No. 230, Intervenors,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
E.G. & H. INC., dba Las Vegas Club; Scott Corporation, dba
Union Plaza Hotel & Casino, J.D. Fiorito, Paul Fiorito,
Elmer Detore, U.L. Merlino, Ernest Feruillo, Juanita Nevone,
Calvin Tischer, George Morini, Craig I. Ghelfi, and Jack R.
Picardo, dba Golden Gate Hotel and Casino, Respondents.
 Nos. 89-70472, 89-70546.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 7, 1991.
Decided Nov. 8, 1991.
As Amended Dec. 19, 1991.
 
 Gary G. Moss, Wyman Bautzer Kuchel & Silbert, Los Angeles, Cal., for petitioners-cross-respondents.
 Laurence S. Zakson, N.L.R.B., Washington, D.C., for respondent-cross-petitioner.
 Barry S. Jellison, Davis, Cowell & Bowe, San Francisco, Cal., for intervenors.
 On Application for Enforcement of an Order of the National Labor Relations Board.
 Before GOODWIN, HUG and FARRIS, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Three Las Vegas casino operators petition for review and seek to set aside a final order of the National Labor Relations Board finding them in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (a)(5), for refusing to comply with a collective bargaining agreement. The NLRB cross-petitions seeking enforcement of its order. We affirm the Board's decision and grant its application for enforcement.
 
 
 2
 For approximately 20 years prior to 1984, the Nevada Resort Association (NRA), a group of casino operators, had bargained through two multi-employer units with Culinary Workers Union Local 226, Hotel Employees and Restaurant Employees International Union, AFL-CIO ("the Union"). The casinos operated pursuant to two substantially similar agreements known as the Downtown Agreement and the Strip Agreement. The main difference between the two agreements was that employees who customarily received tips earned a slightly higher rate of pay at the downtown casinos. This wage differential, known as the "downtown premium," was intended to compensate for the tipping practices of the clientele at casinos located on the Las Vegas Strip and the added attraction at the Strip casinos of free employee parking.
 
 
 3
 During the 1984 negotiations, the petitioning employers ("the Employers") sought to eliminate the premium paid to downtown workers. On April 2, after the existing bargaining agreements expired, the Union struck the casinos. During April and May the parties continued to negotiate, and agreements were gradually reached between some individual casino hotels and the Union. On May 19-21, the NRA negotiated with the Union on behalf of 10 or 11 casinos. The parties reached a final oral agreement which was ratified by the Union on May 24. The petitioners in this proceeding were among the operators who did not execute an agreement ratified by Local 226 on May 24.
 
 
 4
 After the Union ratified the May 24 agreement, eight Strip casinos executed written agreements. Five downtown casinos that had been participating in on again, off again bargaining refused to execute agreements retaining the downtown premium. However, the downtown casinos apparently complied with all terms of the oral agreement except for paying the wage premium.
 
 
 5
 The Union then initiated grievance proceedings, arguing that the Employers had committed an unfair labor practice by refusing to execute and give effect to collective bargaining agreements incorporating the terms contained in the oral agreements ratified by Union members. The Employers argued that no agreement existed because they had never consented to the downtown premium. They further contended for the first time that even if an agreement had been reached, the NLRB was without power to enforce it because the bargaining units included supervisors.
 
 
 6
 The Administrative Law Judge noted that for 20 years the Employers had knowingly agreed to include some supervisors in the bargaining unit and had never before questioned the appropriateness of the unit until the present controversy resulted in unfair labor practice charges. The ALJ found the units to be appropriate.
 
 
 7
 The NLRB, while disagreeing with the ALJ's finding that the units were appropriate, stated that "when parties have voluntarily agreed to include supervisors in a unit for purposes of bargaining, the Board will order the application of the terms of a collective-bargaining agreement to those supervisors." 296 N.L.R.B. No. 117, at 2 n. 4 (1989). The NLRB ordered the Employers to sign the collective bargaining agreement that was ratified on May 24, 1984, and to give retroactive effect to the terms of that agreement.
 
 
 8
 In a separate proceeding prior to the section 8(a)(5) hearing, the Employers had filed a complaint in federal district court seeking to stay any NLRB proceedings on the ground that the NLRB was without statutory authority to enforce an agreement reached with a bargaining unit that included supervisors. The district court held that review was preempted because the Employers would have an opportunity to appeal any NLRB decision to the appropriate court of appeals. Scott Corp. v. NLRB, 683 F.Supp. 1312, 1319 (D.Nev.1987). We agree.
 
 I. Appropriateness of the Bargaining Unit
 
 9
 Section 9 of the National Labor Relations Act, 29 U.S.C. § 159, deals with the designation of bargaining representatives. In subsection 9(b), the Act states that the Board "shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." 29 U.S.C. § 159(b).
 
 
 10
 The Employers interpret section 9(b) to require the NLRB to make a threshold "unit appropriateness" determination in every case it considers before it can reach the merits of any other question. The Employers argue that this is an affirmative, nondelegable duty and that the voluntary consent of the parties to a bargaining unit is irrelevant to the discharge of this duty. The Board denies that it has ever been charged with such a duty when nothing turned on defining the bargaining unit.
 
 
 11
 The Employers argue that "numerous courts of appeal" have held that if the Board finds that a unit is not appropriate, or fails to make an appropriateness determination, "it is precluded from taking any further action." Each of the cases cited by the Employers for this proposition, however, involved controversies about the bargaining unit itself. See NLRB v. Indianapolis Mack Sales & Serv., Inc., 802 F.2d 280, 283 (7th Cir.1986) (requiring Board to make unit appropriateness determination where successor owner refused to recognize union on grounds of a good-faith doubt about the union's majority support); NLRB v. Cardox Div. of Chemetron Corp., 699 F.2d 148, 153 (3rd Cir.1983) (requiring Board to make unit appropriateness determination where union filed an unfair labor practice charge against employer for withdrawing recognition of the union and the employer had withdrawn recognition after the only two employees in the unit resigned from the union); Big Y Foods, Inc. v. NLRB, 651 F.2d 40, 45-46 (1st Cir.1981) (reviewing manner in which Board made appropriateness determination where there was no dispute over whether Board was required to make such a determination); Memorial Hosp. v. NLRB, 545 F.2d 351, 360 (3rd Cir.1976) (holding that Board violated its duty where it failed to make its own appropriateness determination after employer had challenged unit appropriateness and state labor board had certified the unit as appropriate); Supreme Sugar Co., 258 N.L.R.B. 243 (1981) (holding that even though employer had earlier voluntarily included guards in bargaining unit, Board was required to make appropriateness finding where employer later refused to accept guards as part of the unit).
 
 
 12
 The Employers have cited no cases in which either an appellate court or the NLRB itself has held that the Board was required to make a pro forma appropriateness determination where nothing turned on section 9(b) appropriateness. The underlying issue in the present case has nothing to do with certifying the bargaining unit, recognizing the union, or otherwise approving or disapproving the bargaining unit. The parties stipulated that both sides had accepted bargaining units that included "some" supervisors.
 
 
 13
 We note that the NLRB does not make a unit appropriateness determination in every case that comes before it. See, e.g., Teamsters Local 70, 288 N.L.R.B. 1224 (1988) (making no unit appropriateness finding in case involving dispute over propriety of union picketing); Laborers' Int'l Union, Local 721, 288 N.L.R.B. 1246 (1988) (making no unit appropriateness finding in case involving dispute over which union should perform certain work at a construction site); Fortinbras Servs., Inc., 288 N.L.R.B. 545 (1988) (making no unit appropriateness finding in case involving challenges to ballots in certification election).
 
 
 14
 The Board argues that "in the absence of extraordinary circumstances or a clear denial of employees' rights, once an employer has recognized a union ... the employer may not ... repudiate the bargaining relationship on the ground that the Board might have found a different unit appropriate had the matter been brought before it initially." We agree with the Board. The Employers' argument is an attempt to defeat a section 8(a)(5) charge by seizing upon a wholly irrelevant issue.
 
 
 15
 In Arizona Electric Power Cooperative, Inc., 250 N.L.R.B. 1132 (1980), upon which the Board relied in its decision, the employer had argued that load dispatchers were supervisors and should not be included in the bargaining unit. The Regional Director, however, ruled that the load dispatchers were employees, and the employer did not contest the unit certification which included the load dispatchers. The employer then proposed that the chief load dispatcher be included in the unit, even though the parties had stipulated that he was a supervisor. The union agreed to his inclusion in the unit. The parties then agreed to a contract. During its term, the employer withdrew recognition from the union for all load dispatchers on the ground that they were supervisors. Id. at 1132-33. The Board noted that the contract had been "executed with full knowledge of the nature of the present duties of the dispatchers" and held that the employer had violated the Act by its withdrawal of recognition from the union for the load dispatchers. Id. at 1133. The Board stated that it could "appropriately issue a bargaining order covering a unit which it could not have initially certified under the Act, but concerning which the parties have knowingly and voluntarily bargained." Id.
 
 
 16
 Arizona Electric was cited with approval by this court in American Metal Products, Inc. v. Sheet Metal Workers International Ass'n, Local 104, 794 F.2d 1452 (9th Cir.1986). The Employers argue that the citation is irrelevant because American Metal did not involve supervisors. We disagree.
 
 
 17
 In American Metal we held, inter alia, that where a duty to bargain arose from a collective bargaining agreement rather than from statutory obligations an NLRB finding of an appropriate bargaining unit was not necessary as a precondition to contract negotiations. The employer's obligation to arbitrate new contract terms was not canceled "by its claim that it no longer had a statutory duty to bargain under the National Labor Relations Act." American Metal, 794 F.2d at 1455. Citing Arizona Electric, we noted that "[a]n employer may contractually allow a union to represent employees who may not be permitted to vote in a NLRB election." Id. Though it is true that American Metal did not involve supervisors, the case approved the general principle in Arizona Electric upholding voluntary agreements to bargain with a particular unit.
 
 
 18
 In this case, even though the agreement had not yet taken effect, the parties had completed bargaining, and the Board has found that both parties believed they had reached an agreement. Even though the instant case does not involve a midterm dispute, it would be equally destructive of stable bargaining relationships to permit an employer, after voluntarily agreeing to bargain with a particular unit, to repudiate an agreement on the ground that the unit was not appropriate.
 
 
 19
 We need not reach the question whether the National Labor Relations Act bars the NLRB from enforcing a collective bargaining agreement if the bargaining unit includes supervisors. The Employers seek comfort in statutory language providing that "no employer ... shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law ... relating to collective bargaining." 29 U.S.C. § 164(a). Nobody, however, has compelled the casinos to deem supervisors to be employees. The NLRB seeks to enforce a labor agreement between employers and a bargaining unit that for many years included supervisors with the employers' consent.
 
 
 20
 We note that the Supreme Court has not repudiated the notion that where an employer has consented to a bargaining unit that includes supervisors, the NLRB properly may find the employer guilty of an unfair labor practice with respect to that bargaining unit. In NLRB v. News Syndicate Co., 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29 (1961), where the bargaining unit included supervisors, the NLRB had found that both the employer and the union had committed unfair labor practices by operating an unlawful closed shop and preferential hiring system. The court of appeals reversed, holding that the alleged discrimination had not occurred. The Supreme Court affirmed, holding the contract at issue to be lawful. See id. at 696-99, 81 S.Ct. at 850-52. The Court did not discuss the issue of "unit appropriateness," but it noted in passing that while an employer could not be compelled to recognize a union containing supervisors, the employer certainly could do so voluntarily. Id. at 699 n. 2, 81 S.Ct. at 852 n. 2. The authority of the Board to recognize a union containing supervisors would have little meaning if the NLRB were powerless to enforce any agreements reached with such a union.
 
 II. Review of the Board's Findings
 
 21
 We must regard NLRB findings of fact as conclusive if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. 160(f).
 
 
 22
 The ALJ found that the parties believed they had reached a final agreement, that "enforceable contracts did come into being," and that those contracts retained the downtown premium. ALJ Decision at 12. The ALJ stated in detail the facts on which he relied in reaching his conclusion. The Board affirmed these findings.
 
 
 23
 The parties in their briefs to this court reargue the facts that were before the ALJ. For example, a central aspect of the dispute was whether the parties agreed to particular wage rates or only to the amount of wage increases. The Union argues that the agreement referred only to wage increases and thus preserved the underlying differential wage structure. Another factual dispute concerned the effect of a "most favored nation" agreement. The Employers stress that the Union had verbally agreed that no employer would be subject to an agreement less favorable than that achieved by any other employer. The Board concluded that this clause was irrelevant to the downtown premium issue because the Downtown and Strip agreements were treated separately. Under the agreement applicable to the downtown casinos, for example, those employers paid a wage premium but did not provide free parking. By contrast, the Strip casinos provided free parking but did not pay a wage premium. The Employers apparently did not argue that the "most favored nation" agreement should have permitted the Strip casinos to stop providing free parking.
 
 
 24
 Finding substantial evidence to support the Board's decision, we deny the petition for review and enforce the Board's order.
 
 
 25
 PETITION DENIED; ENFORCEMENT GRANTED.